[No. A029367. First Dist., Div. One. Feb. 11, 1987.]

PHILIPPINE AIRLINES, INC., Cross-complainant and Appellant, v. McDONNELL DOUGLAS CORPORATION, Cross-defendant and Respondent.

COUNSEL

Kern & Wooley, Ralph S. LaMontagne, Jr., for Cross-complainant and Appellant.

Morgenstein, Ladd & Jubelirer, Morgenstein & Jubelirer, Marvin D. Morgenstein, Jeffrey R. Williams, James M. Braden, Marilyn D. Abrams, Bryan, Cave, McPheeters & McRoberts, John J. Hennelly, Jr., Dennis E. O'Connell and Curtis M. Dombek for Cross-defendant and Respondent.

OPINION

**ELKINGTON, Acting P. J.**—McDonnell Douglas Corporation (MDC) sold to Philippine Airlines (PAL) a DC-10 Series aircraft.[1] As relevant to the issues on appeal, MDC warranted under the sales agreement that the aircraft would be free from defects and that the extent of its liability under the warranty was limited to the repair, replacement or correction of any defective part. And at the end of the agreement, just above the signature lines, appeared the following paragraph:

"The warranty and service life policy provided in this article and the obligations and liabilities of seller under said warranty and service life policy are exclusive and in lieu of, and buyer waives all other remedies, warranties, guarantees or liabilities, express or implied, with respect to each aircraft,

---

[1]The sale in fact arose from an assignment to PAL of the rights of KLM Royal Dutch Airlines (KLM) to purchase an aircraft under an existing contract between KLM and MDC. By the terms of the sales and assignment agreements, PAL was entitled to the same, but no additional, rights as KLM had against MDC.

product and article delivered hereunder, arising by law or otherwise (including, without limitation, any obligation or liability of the seller arising from negligence or with respect to fitness, merchantability, loss of use, revenue or profit or consequential damages). This warranty or service life policy shall not be extended, altered or varied, except by a written instrument signed by seller and buyer."

PAL took possession of the aircraft. On August 19, 1977, a "rejected take-off" occurred apparently resulting in personal injuries to a number of the aircraft's passengers. A number of passengers filed suit in California against PAL, and PAL cross-complained for indemnity against MDC alleging, generally, that MDC's negligence in the manufacture of the aircraft was the cause of the rejected take-off.

The superior court, following the first phase of a bifurcated trial, determined that the limitation of liability clause in the parties' contract barred PAL's right to recover indemnity from MDC, and entered judgment in favor of MDC on the cross-complaint. PAL appeals from that judgment.

I. *Contention*: "The disclaimer fails to clearly and explicitly state that the buyer is waiving all rights to seek indemnity for payments made to personal injury claimants."

■ Commercial entities, such as PAL and MDC, are entitled to contract to limit the liability of one to the other, or otherwise allocate the risk of doing business (Cal. U. Com. Code, §§ 2316, subds. (2), (4), 2719; *Delta Air Lines, Inc.* v. *Douglas* (1965) 238 Cal.App.2d 95, 102-105 [47 Cal.Rptr. 518]; and see also *Airlift Intern., Inc.* v. *McDonnell Douglas Corp.* (9th Cir. 1982) 685 F.2d 267, 270), and *Scandinavian Airlines* v. *United Aircraft* (9th Cir. 1979) 601 F.2d 425, 427-429, interpreting Cal. law). However, contractual clauses seeking to limit liability will be strictly construed and any ambiguities resolved against the party seeking to limit its liability for negligence.

"The language of an agreement in order to exclude liability for negligence must be 'clear and explicit' and 'free of ambiguity or obscurity.' (*Conservatorship of Link* (1984) 158 Cal.App.3d 138, 143 [205 Cal.Rptr. 513].) The law generally looks with disfavor on attempts to avoid liability or to secure exemption for one's own negligence. (*Celli* v. *Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 518 [105 Cal.Rptr. 904].) The law requires exculpatory clauses to be strictly construed against the party relying on them. (*Id.,* at p. 519.)

■ "For an agreement to be construed as precluding liability for 'active' or 'affirmative' negligence, there must be express and unequivocal language

in the agreement which precludes such liability. (*Vinnell Co.* v. *Pacific Elec. Ry. Co.* (1959) 52 Cal.2d 411, 414-415 [340 P.2d 604]; *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 48-49 [41 Cal.Rptr. 73, 396 P.2d 377].) An agreement which seeks to limit liability generally without specifically mentioning negligence is construed to shield a party only for passive negligence, not for active negligence. (*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* [(1983)] 147 Cal.App.3d 309, 317-318; *Celli* v. *Sports Car Club of America, Inc., supra,* 29 Cal.App.3d 511, 518-519; *Basin Oil Co.* v. *Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 595 [271 P.2d 122]; see also *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628, 633 [119 Cal.Rptr. 449, 532 P.2d 97].)" (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 932-933 [218 Cal.Rptr. 839].)

■ Turning to the limitation of liability clause at issue, we find, notwithstanding the application of these strict rules of interpretation, its wording to be unambiguous and its meaning to be clear. In it, MDC's liability was limited to the remedies set forth in the agreement. MDC would not otherwise be liable for loss caused by its negligence, which loss would ordinarily include payment of claims filed against PAL as a result of MDC's negligence. Moreover, the clause further provides that, except as otherwise stated in the agreement, MDC would not be liable for consequential damages, a term defined by the Commercial Code as including "(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty." (Cal. U. Com. Code, § 2715.)

We do *not* agree, as argued by PAL, that the language of the clause "clearly relates to *damage to the aircraft* and not which party will bear ultimate *personal injury* liability." It simply and clearly excludes any and all claims PAL might have against MDC, whatever their genesis, other than as expressly permitted in the parties' agreement.

II. *Contention:* "The term 'consequential damages,' as utilized in the disclaimer, cannot be construed as including appellant's personal injury indemnity claims herein."

■ The limitation of liability phrase exempts MDC from any loss to PAL "arising from negligence, or with respect to fitness, merchantability, loss of use, revenue or profit or consequential damages." Thus, insofar as PAL's loss arose from MDC's negligence, it could not be recovered under the terms of the agreement. Insofar as it resulted from "fitness, merchantability, loss of use, revenue or profit or consequential damages"—i.e., insofar as PAL's legal

remedy arose not from the law of negligence, but from the law of breach of warranty, it was likewise excluded, except, of course, as expressly provided by the contract.

PAL argues that "Numerous reported California decisions support the conclusion that the term 'consequential damages' is insufficient, as a matter of law, to encompass personal injury indemnity claims in the context of a disclaimer clause." The argument fails on a number of grounds.

First, as PAL itself argues in a different context, the term "consequential damages" in the clause relates to breach of warranty and not to negligence. Thus, under the terms of the agreement, MDC is exempt from *any* loss arising from its negligence, whether or not that loss could be defined as "consequential damages," and whether or not it represented payments for personal injury damages.

Second, the cases cited by PAL, negligence cases, do not preclude a party from limiting its liability for damages, consequential or otherwise, arising from its own negligence. They hold only that unless such a limitation is express and certain it will be ineffective. For example, it was held, "[T]o be sufficient as an exculpatory provision against one's own negligence, the party seeking to rely thereon must select words or terms clearly and explicitly expressing that this was the intent of the parties." (*Celli* v. *Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 519 [105 Cal.Rptr. 904].) And, "There is in [the limitation of liability clause] no mention of negligence and the writing must be strictly construed, with the result that it does not cover defendant's own negligence." (*Woodall* v. *Wayne Steffner Productions* (1962) 201 Cal.App.2d 800, 814 [20 Cal.Rptr. 572].)

The clause in the present case clearly and explicitly limited MDC's liability for *negligence.*

Third, if PAL's argument can be interpreted that "consequential damages" do not include personal injury damages for breach of warranty, the argument fails in light of Commercial Code section 2715, *supra* (and see *Howe* v. *Pioneer Mfg. Co.* (1968) 262 Cal.App.2d 330, 347 [68 Cal.Rptr. 617]).

Finally, it must be emphasized that PAL is not seeking to recover personal injury damages, but a monetary loss resulting from its payment of such damages to others. "A tort defendant's claim for comparative indemnity from a concurrent tortfeasor is separate and distinct from the injured party's claim against the tortfeasors. . . ." (*County of Riverside* v. *Loma Linda University* (1981) 118 Cal.App.3d 300, 315 [173 Cal.Rptr. 371].)

III.   *Contention*:   "As a matter of law, the exculpatory provision is contrary to the public interest, and, accordingly, unenforceable."

■   In *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441], the court while holding, "While obviously no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party," (*id.,* at p. 101), also set forth a number of factors to be considered in determining if an exculpatory clause contained in a contract should be invalidated as conflicting with the public interest.

"In placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough outline of that type of transaction in which exculpatory provisions will be held invalid. Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Id.,* at pp. 98-101.)

From our examination of the agreement at issue, the parties, and their relative bargaining powers, we conclude that the exculpatory clause does not conflict with the public interest, but is rather the result of a "private, voluntary transaction in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party." In reaching this conclusion, we find persuasive the discussion of the court in *Delta Air Lines, Inc.* v. *Douglas, supra,* 238 Cal.App.2d 95, analyzing a similar exculpatory clause in a similar factual context. That analysis, while lengthy, bears repetition here.

"It is clear from the record that Delta, one of the major airlines of the nation, with the aid of a staff of experienced executives and attorneys, had

negotiated a contract with terms individual to Douglas. There is not, nor can there be, any doubt that Delta knew that the exculpatory clause was in the contract, and that it voluntarily agreed to it. It is suggested that the contract took on an element of a 'contract of adhesion' in that the clause was part of Douglas' standard form. But the clause clearly was open to negotiation, and Delta was free to seek another airplane from another manufacturer on terms which (so far as this record shows) would not have included such a clause. . . .

. . . . . . . . . . . . . . . . . . .

"Nor, although it is true that the manufacture and operation of aircraft is a matter of federal regulation, do we here have the kind of 'public interest' to which the above quotation refers. [Citing *Stephens* v. *Southern Pacific Co.* (1895) 109 Cal. 86 (41 P. 783, 50 Am.St.Rep. 17, 29 L.R.A. 751)] . . .

"Douglas dealt with Delta in a similar manner. The fact that Delta is a regulated enterprise and carries passengers has no relevance to the present decision. The upholding of the exculpatory clause will not adversely affect rights of future passengers. They are not parties to the contract and their rights would not be compromised. They retain their right to bring a direct action against Douglas for negligence. (*MacPherson* v. *Buick Motor Co.* (1916) 217 N.Y. 382 [111 N.E. 1050, Ann.Cas. 1916C 440, L.R.A. 1916F 696].) Also, their right to bring an action against Douglas for breach of implied warranty would not be interfered with because the passengers were not a party to the contract containing the exculpatory clause.

"In short, all that is herein involved is the question of which of two equal bargainers should bear the risk of economic loss if the product sold proved to be defective. Under the contract before us, Delta (or its insurance carrier if any) bears that risk in return for a purchase price acceptable to it; had the clause been removed, the risk would have fallen on Douglas (or its insurance carrier if any), but in return for an increased price deemed adequate by it to compensate for the risk assumed. We can see no reason why Delta, having determined, as a matter of business judgment, that the price fixed justified assuming the risk of loss, should now be allowed to shift the risk so assumed to Douglas, which had neither agreed to assume it nor been compensated for such assumption." (*Id.,* at pp. 102-105.)

PAL advances two theories in addition to those discussed and rejected by the court in *Delta Air Lines, Inc.* v. *Douglas, supra,* or specifically addressed in *Tunkl* v. *Regents of University of California, supra,* by which it argues that the exculpatory clause at issue must be struck down as violating public policy.

In the first of these PAL points out that current law provides passengers with a quick and easy remedy against a carrier. The passengers therefore

"have greater incentive to file suit against an air carrier than an aircraft manufacturer, even though the particular accident may have been a proximate result of the manufacturer's negligence." Thus, PAL argues, "in many instances the *only* way in which a manufacturer will be subject to liability will be via an indemnity claim filed by the airline. . . . Clearly, such a state of affair creates a substantial economic *disincentive* for a manufacturer to produce safe aircraft and is *directly contrary* to the public policy which *favors* 'economic incentive[s] to improved product safety' and 'induc[es] the reallocation of resources toward *safer* products.' (Italics added.) [*McDonald*] v. *Sacramento Medical Foundation Blood Bank* (1976) 62 Cal.App.3d 866, 874 [133 Cal.Rptr. 444]."

PAL's second theory is that the exculpatory clause disfavors *settlement* of claims. "Clearly a defendant which knows it will have the right to seek reimbursement from another tortfeasor for settlement payments made to personal injury claimants will be far more inclined to make such payments than will a defendant which knows that it will have to bear ultimate responsibility for 100 percent of such payments."

Each of these theories might be asserted in *any* action involving an allocation of risk, yet, as discussed, contractual allocations of risk in nonconsumer commercial settings are routinely upheld. The reason, we think, lies with our laws of negligence and products liability, and with the economic realities of the marketplace. It may be true, as PAL argues, that the ultimate consumer —here the passenger—is provided with a streamlined remedy against the carrier. Given, however, the realities of litigation, and the possibility that a carrier might have insufficient resources to cover what might be extensive liability should an aircraft malfunction, it would make little economic sense for a manufacturer to place on the market a defective product on the belief that it somehow would be insulated from the personal injury claims of passengers. Moreover, and aside from its potential liability to passengers, a manufacturer whose defective products caused its customers to be sued would not long remain in business. And a manufacturer such as MDC is still answerable to the Federal Aviation Commission.[2] We are thus of the opinion that the argued "disincentive" to produce safe aircraft resulting from a finding that the disclaimer of liability at issue is valid, is largely illusory.

And as to PAL's last theory, we fail to comprehend that a defendant, who

---

[2]We take note of the provisions of 14 Code of Federal Regulations, section 21.165: "The holder of a production certificate shall—

"(a) Maintain the quality control system in conformity with the data and procedures approved for the production certificate; and

"(b) Determine that each completed product submitted for airworthiness certification or approval conforms to the type design and is in a condition for safe operation."

has bargained to assume all the risk should a product fail, and who presumably has taken such steps as are necessary to insure that risk, would be any less interested in settling legitimate claims than would a defendant who has not assumed the entire risk.

We note further that clauses similar to the one at issue have been upheld by the courts (*Delta Air Lines, Inc.* v. *Douglas Aircraft Co., supra,* 238 Cal.App.2d 95, 104-105; *Aeronaves de Mexico, S.A.* v. *McDonnell Douglas* (9th Cir. 1982) 677 F.2d 771, 773; *Tokio Marine & Fire Ins.* v. *McDonnell Douglas Corp.* (2d Cir. 1980) 617 F.2d 936, 939-940; *Delta Air Lines, Inc.* v. *McDonnell Douglas Corporation* (5th Cir. 1974) 503 F.2d 239, 243-246). Although we recognize, as emphasized by PAL, that these cases involved property damage only, we find for the reasons we have discussed, that the distinction between property damage and personal injuries is of no legal importance as it relates to the clause at issue. The damage to PAL was economic, and PAL expressly contracted to limit its remedies for economic loss. The injured passengers may still seek recovery from MDC should they so choose.

The judgment is affirmed.

Newsom, J., and Holmdahl, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 29, 1987.