**Barry A. KEMELHOR, Plaintiff,**

v.

**PENTHOUSE INTERNATIONAL, LTD., Defendant.**

**No. 85 Civ. 0002 (CHT).**

United States District Court, S.D. New York.

June 3, 1988.

---

Scheffler Karlinsky & Stein, New York City (Martin E. Karlinsky, of counsel), for plaintiff.

Grutman Miller Greenspoon & Hendler, New York City (Jeffrey H. Daichman and Joseph Santora, of counsel), for defendant.

## OPINION

TENNEY, District Judge.

This is a diversity action for wrongful discharge from employment and breach of contract brought by plaintiff Barry A. Kemelhor ("Kemelhor") against defendant Penthouse International, Ltd. ("Penthouse"), the publisher of PENTHOUSE magazine. Penthouse asserts a counterclaim alleging that Kemelhor materially breached the contract thereby entitling Penthouse to terminate it. In addition, Penthouse requests restitution for the salary and other payments it paid Kemelhor. With the consent of the parties, the case was tried to the court. Pursuant to Fed.R. Civ.P. 52(a), the court makes the following Findings and Conclusions.

## FINDINGS OF FACT

Kemelhor has been a collector of photographs of celebrity nudes since 1977, and since September 1979, he has engaged in the commercial exploitation of his collection by entering into agreements with several men's magazines allowing them to publish items from his collection. Trial Transcript ("Tr.") at 15–19.

On September 9, 1981, Kemelhor wrote a letter to Penthouse which stated that he was interested in offering both his collection and his services to the magazine. Plaintiff's Exhibit ("Pl.Exh.") 1. The service offered was his alleged unique ability to locate nude photos of women published before the subjects had become famous. Tr. 17. At the time Kemelhor contacted Penthouse, Kemelhor claimed that he had amassed a collection of more than 100,000 photographs. *Id.*

The photographs forming the collection offered to Penthouse were not taken by Kemelhor. Rather, Kemelhor had cut out many of these pictures from numerous magazines, books, and similar sources. Some pictures were publicity stills issued by various movie studios. Tr. 27, 29, 30. The women in the photographs ranged from early film starlets to current celebrities. Pl.Exhs. 3, 4, 5, 6.

Subsequent to his preliminary communication with Penthouse, Kemelhor met with Joe Brooks ("Brooks"), the art director of PENTHOUSE, on October 23, 1981. At the meeting Kemelhor displayed a number of pictures from his collection. Kemelhor informed Brooks that he was not a photographer and explained how he had assembled his collection. Kemelhor and Brooks discussed the potential risks that publication would entail. Tr. 27–30. The meeting concluded with Brooks telling Kemelhor

that Penthouse would be following up on this discussion. Tr. 31.

Penthouse contacted Kemelhor and a meeting with its chairman of the board, Bob Guccione ("Guccione"), was arranged. Kemelhor met with Guccione on November 13, 1981 for more than five hours. Kemelhor disclosed to Guccione the nature of his collection, Tr. 35–38, and Kemelhor also exhibited a number of photos from his assemblage. Tr. 32–42. Guccione displayed substantial interest in the photographs and also in the manner in which Kemelhor had built his collection. Guccione told Kemelhor that he would be deciding how best to consummate an agreement. Tr. 40–41.

A second meeting between Kemelhor and Guccione was held on December 30–31, 1982. Tr. 43–45. This discussion focused on the structure of an agreement including potential feature articles and special editions. Tr. 50–52. At the end of the meeting, Guccione told Kemelhor that Penthouse would draft an agreement. Tr. 52–53.

After a series of drafts were sent back and forth, an agreement dated April 16, 1982 was executed. Pl.Exh. 40. The pertinent provisions of the agreement were as follows:

1. The Employer hereby employs Employee in its business, and Employee hereby agrees to work for the Employer, as a feature columnist for, and senior editor of, PENTHOUSE MAGAZINE (the "Magazine"), and senior contributing editor of certain books and other publications intended to be published by Employer, as more particularly described herein.

\* \* \* \* \* \*

3. *Employee represents and warrants that:*

\* \* \* \* \* \*

B. *He, as the collector of such pictures, is the owner of the Library, has obtained the pictures constituting the Library from publications and other sources in the public domain and is under no known obligation to make* *payment to anyone by reason of his possession or use thereof.*

\* \* \* \* \* \*

6. Employee shall be paid hereunder as follows:

A. During the first year of the Initial Employment Period, Employer shall pay to Employee a salary at the rate of Fifty Two Thousand Dollars ($52,000) per annum ("Base Salary") in equal monthly installments payable on the 1st day of each calendar month, commencing May 1, 1982.

\* \* \* \* \* \*

C. Employer shall pay to Employee the sum of Thirty Thousand Dollars ($30,000) in two equal installments, $15,000 upon the execution of this agreement and $15,000 on September 1, 1982. . . .

\* \* \* \* \* \*

8. Employee acknowledges that the Employer, as publisher, has the final decision making authority as to the Pictures and textual material which will be utilized and be published in the Magazine. *In the event the Employer determines in its sole and absolute discretion that publication of the Feature and the use of the Pictures has been and/or will cause legal problems which do not justify such publication, Employer shall give Employee written notice of its intent to terminate this Agreement. In such event Employer shall have no further liability or obligation hereunder except to (i) pay Employee three (3) months severance pay, which shall be based upon all amounts payable under Section 6(A) hereof, [and] (ii) return to Employee any and all pictures not owned by Employer. . . .*

\* \* \* \* \* \*

13. Employee acknowledges the importance of the exclusivity of his services to the Employer hereunder. . . .

(Emphasis added).

Subject to the termination provisions of Section 8, Kemelhor's employment was to commence on May 1, 1982 and continue for a five-year period terminating April 30,

1987 with provision made for the negotiation of an extension.

Kemelhor was to receive an annual salary of $52,000 payable in equal monthly installments, and was to be reimbursed for his expenses. In addition, Kemelhor was to receive $30,000 in two equal installments, $15,000 on the signing of the agreement and $15,000 on September 1, 1982, which amounts were not to be refundable in the event no royalties on possible book publications were forthcoming.

Kemelhor initiated his performance under the contract by submitting a feature to Penthouse in mid-May 1982. It was titled "Pre-Vues of Coming Attractions." Pl. Exh. 41. The feature contained forty-one photographs. Kemelhor did not receive immediate feedback from Penthouse regarding the feature. Tr. 90. The feature and the pictures contained therein have never been returned to Kemelhor. Tr. 87–88. Although the exact whereabouts of the material is unknown, Penthouse concedes it retains possession. Tr. 328.

Kemelhor submitted his second and last feature to Penthouse on July 12, 1982. Tr. 90. Kemelhor testified that after submitting his second feature Guccione explicitly instructed him not to submit a feature every month but rather have one feature ready for publication at all times. Tr. 104–05. The second feature coined "Legends of the Screen," contained seventy-three pictures. Pl.Exh. 42. The feature included pictures of Joan Crawford, Carol Lombard, Clara Bow, and Jean Harlow. *Id.* Shortly following this final submission, Penthouse's art director, Frank DeVino ("DeVino") telephoned Kemelhor regarding the submission. DeVino inquired of Kemelhor whether he had any original photographic material. Kemelhor replied that he did not possess any photographic negatives since he had cut out the pictures from books and magazines. DeVino told Kemelhor that the material furnished was sufficient. Tr. 92.

On July 29, 1982, Kemelhor was contacted by Jonathan Black ("Black"), a senior editor of PENTHOUSE. Tr. 92–93. During the course of their phone conversation, Black informed Kemelhor that he was drafting an introduction to the first feature and needed some background information concerning both the pictures and Kemelhor. Kemelhor furnished Black with his biographical background. They also scheduled a meeting to be convened in New York on August 4, 1982. In advance of the meeting and pursuant to Black's request, Kemelhor sent Black a list of the sources for the pictures constituting the first feature. Tr. 93–95. The list provided by Kemelhor stated that the sources for the feature were magazines such as BUNTE, HIGH SOCIETY, LIFE, NEWSWEEK, and others. Pl.Exh. 45. The meeting took place as scheduled on August 4, 1982. At the meeting, Black asked additional questions regarding the sources of the feature. Tr. 95. During Kemelhor's visit to New York he requested and was granted a meeting with Guccione. Kemelhor expressed concern with Penthouse's lack of communication with him but was assured by Guccione that no problem existed. Tr. 102. Kemelhor also presented to Guccione a proposal for a special edition of PENTHOUSE. Kemelhor had assembled a collection of seventy-three nude or semi-nude poses of actresses who had won or been nominated for best supporting actress. The compilation was titled "The Anatomy Awards." Tr. 103; Pl.Exh. 46. Guccione expressed strong interest in Kemelhor's idea. Tr. 104.

On September 1, 1982, the second half of the $30,000 non-refundable advance against royalties was due Kemelhor. Penthouse did not make this payment. Tr. 113–14. Kemelhor advised David Myerson ("Myerson"), Penthouse's chief operating officer and general counsel, that he did not receive the payment. Myerson told Kemelhor that he would receive it shortly. Tr. 116. Although Myerson may have at that point in time intended to pay Kemelhor, he admits that shortly thereafter during the fall of 1982, he deliberately withheld the payment. Tr. 317.

In late August or early September 1982, Myerson sent a transmittal letter and memorandum to Kemelhor. Tr. 121; Pl.Exhs.

50, 51. The memorandum suggested that Kemelhor come to New York and meet with several members of the Penthouse staff. *Id.*

At the same time, Myerson communicated with both inside and outside counsel to Penthouse proposing that a meeting between Kemelhor and counsel be convened. Pl.Exh. 52. The purpose of the meeting was to determine ways to protect Penthouse from potential copyright or invasion of privacy lawsuits. *Id.*

The proposed meeting took place on September 13, 1982 in the offices of Penthouse. Tr. 125. The attendees included Kemelhor, Black, Larry Sutter ("Sutter"), Penthouse's inside counsel, Faustin Jehle, Penthouse's outside counsel, and Larry Abelman, counsel for another publication, HIGH SOCIETY, who had been consulted by Penthouse. The gist of the discussion were comments regarding the risks attendant to publishing the photographs. Tr. 130.

In mid-September 1982, Kemelhor received a letter from Black regarding the feature submitted in May. Pl.Exh. 48. The letter requested that Kemelhor look at the captions to be associated with the first feature. The letter made no reference to any problem Penthouse had encountered concerning this first submission. *Id.*

On September 14, 1982, Kemelhor received from Black a draft of an introduction to the "Celebrity Sleuth" concept. Pl. Exh. 43. On September 17, 1982, Kemelhor mailed to Black the draft with suggested modifications. Pl.Exh. 44. Penthouse then received several opinion letters from outside counsel regarding the risk of publishing the Kemelhor photographs. Defendant's Exhibits ("Def.Exh.") O, P, Q.

On October 20, 1982, Sutter spoke with Kemelhor by phone regarding the second submitted feature. Sutter asked Kemelhor for more information about the sources of the pictures. Sutter specifically inquired of the exact magazine or book from which Kemelhor had cut out the photograph. Kemelhor called Sutter back later in the day and furnished the requested information. Tr. 136–37.

On December 7, 1982, Sutter wrote two memorandums to Myerson. The first was an evaluation of the legal risks in connection with the photographs submitted by Kemelhor. The evaluation of the risks associated with the first feature were that eight pictures posed zero risk, four showed low risk, and three substantial risk. In regard to the second feature, the evaluation indicated zero risk with respect to five of the pictures, and low risk connected to eight pictures. Pl.Exh. 62. The second memorandum was a summary of possible legal consequences of terminating the agreement. Pl. Exh. 63.

On December 15, 1982, Kemelhor wrote a letter to Guccione regarding his relationship with Penthouse. Pl.Exh. 58. The letter conveyed a message that something was seriously wrong with the course of the performance of the agreement. In the letter Kemelhor claimed that Penthouse had failed to abide by the agreement because, among other omissions, it failed to pay him the September 1, 1982 installment, give him feedback, or explore projects with him. *Id.*

In response to Kemelhor's letter, Penthouse attempted to discuss the situation with Kemelhor by convening a meeting on February 4, 1983. Tr. 321–22. By letter dated January 31, 1983, Kemelhor rejected the proposed meeting unless certain demands were first satisfied. Pl.Exh. 67. After receiving Kemelhor's rejection, Penthouse made no further salary payments to Kemelhor.

Myerson then wrote to Kemelhor a letter dated February 3, 1983, stating that Kemelhor had violated the agreement by failing to provide photographs that could be used without violating copyright laws. Pl.Exh. 66.

Finally, Guccione wrote a letter to Kemelhor, dated March 24, 1983. Citing the differences between them, he gave notice that Kemelhor's services were no longer required. Pl.Exh. 71. The letter specifically noted that Kemelhor or his attorney should, in the future, communicate with Penthouse's counsel. *Id.*

Kemelhor commenced suit on April 5, 1983 in the Maryland state court against Penthouse alleging breach of contract. Kemelhor claimed damages in the amount of $42,684.62. Kemelhor's affidavit, sworn to March 30, 1983, itemized the damages sought. Included in the damages was the sum of $13,000 representing three months severance pay.

The litigation was removed to the federal district court in Maryland and subsequently transferred to this court. Immediately after the filing of this lawsuit in the state court, Kemelhor signed contracts obligating him to render exclusive services to the publishers of HIGH SOCIETY and CELEBRITY SKIN magazines. The effective date of these contracts was April 5, 1983.

In December 1985, Penthouse moved for summary judgment to dismiss plaintiff's claims and to grant it judgment on its breach of contract counterclaims or, in the alternative, partial summary judgment limiting plaintiff's recoverable damages to what was provided for in the agreement upon termination. In a Memorandum Opinion and Order issued by Judge Constance Baker Motley, 85 Civ. 0002 (S.D.N.Y. Feb. 24, 1986), Penthouse's motions were denied.

### Plaintiff's Claims

Plaintiff claims that defendant breached its contractual obligations by: (1) refusing to pay Kemelhor the $15,000 royalty payment on September 1, 1982; (2) failing to pay Kemelhor his weekly salary starting February 11, 1983; (3) refusing to reimburse Kemelhor for expenses incurred in connection with procuring additional pictures; (4) refusing to utilize good-faith efforts in publishing the submitted features; (5) failing to return Kemelhor's property; (6) refusing to cooperate with Kemelhor regarding the publication of books; (7) failing to assign editorial duties to Kemelhor; and (8) in other respects. Plaintiff's Post–Trial Memorandum ("Pl.Mem.") at 31.

Plaintiff seeks recovery based on the following components:

| | |
|---|---|
| Royalty Payment | $ 15,000.00 |
| Expenses | 9,847.28 |

| | |
|---|---|
| Salary from February 11 to April 4, 1983 | $ 7,500.00 |
| Balance of Salary During Contract | 220,000.00 |
| Contract Severance Pay | 12,000.00 |
| Value of Photographs | 25,000.00 |
| | $289,347.28 |

*Id.* at 31–32.

■ Before trial Kemelhor had claimed damages for lost royalties under the agreement. These royalties would have arisen from the sale of books from which Kemelhor, pursuant to the agreement, was entitled to share. Pl. Pre–Trial Mem. at 52. This claim appears abandoned as it is not mentioned in plaintiff's memorandum. The claim for royalties would fail in any event since the agreement specifically limited Penthouse's liability to three month's severance pay.

■ Plaintiff seeks reimbursement for his expenses. Under the agreement, Kemelhor was obligated to find additional celebrity photographs. Penthouse did reimburse Kemelhor for his initial expenses even though they were not itemized. Tr. 319. Subsequent to these payments, Myerson wrote a letter to Kemelhor stating that Penthouse would no longer reimburse Kemelhor unless he itemized his purchases. Tr. 320; Def.Exh. J. Kemelhor's response was to offer to make a tape recording of his purchases. Penthouse rejected this offer because it reasonably sought a more explicit and verifiable method of documentation. He is therefore not entitled to any further reimbursements.

### Defendant's Counterclaims

Defendant asserts that Kemelhor breached the agreement and hence it is entitled to restitution. Defendant claims that Kemelhor violated the agreement by: (1) not submitting pictures in the public domain, and (2) not submitting a feature each month. Def.Mem. at 34–36.

Defendant seeks restitution for the following payments:

| | |
|---|---|
| April 30, 1982 Royalty Payment | $15,000.00 |
| Kemelhor's 1982 Salary | 35,667.67 |
| Kemelhor's 1983 Salary | 6,000.00 |
| Reimbursement of Expenses | 8,149.33 |
| | $64,817.00 |

Penthouse further argues that Kemelhor breached the agreement by failing to return Penthouse's property. Part of Kemelhor's duties under the agreement were "[t]o seek and obtain new or additional pictures which are similar in nature to those contained in the Library." Pl.Exh. 40, ¶ 5(a). Kemelhor was obligated to transfer the pictures to Penthouse. Kemelhor admits that during his eleven-month relationship with Penthouse he acquired hundreds of additional pictures. Tr. 212. He further concedes that he never offered them to Penthouse. Tr. 210–11.

## CONCLUSIONS OF LAW

### A. *Plaintiff's Claims*

Kemelhor asserts that he was not obligated to provide pictures free of copyright protection. Plaintiff bases this contention on the alleged ambiguity in the words "public domain." Pl.Mem. at 42–45. He contends that the condition contained in the phrase "from publications and other sources in the public domain ...," Pl.Exh. 40, ¶ 3(b), does not mean he warranted that the pictures would be free of copyright protection. Plaintiff also claims that he "was never instructed by Penthouse to submit only non-copyrighted material...." Tr. 88. Thus, according to Kemelhor, he fulfilled his obligations under the contract and it was Penthouse who breached the agreement by terminating him.

### 1. *Contract Interpretation*

The initial question before the court is one of contract interpretation. A contract will not be held to be ambiguous merely because the parties ascribe varying meanings to a specific provision. *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 570 F.Supp. 870, 893 (S.D.N.Y. 1983). For a phrase to be ambiguous, it must be susceptible to at least two reasonable meanings. *Banque Worms v. Banque Commerciale Privee*, 679 F.Supp. 1173, 1180 (S.D.N.Y.1988).

The court will be guided by the well recognized principle that words are to be given their ordinary meaning. *Nipkow & Kobelt, Inc. v. North River Ins. Co.*, 673 F.Supp. 1185, 1187 (S.D.N.Y.1987). The court finds the phrase "in the public domain" completely unambiguous. Public domain is "the realm embracing property rights belonging to the community at large, subject to appropriation by anyone [and] unprotected by copyright or patent." *Webster's Third New International Dictionary* (1986). Kemelhor accepts this definition. Tr. 177. Moreover, Kemelhor concedes he had suggested employing the terminology "public domain." Tr. 64. It was Kemelhor's attorney, Juddson Gould, who inserted this particular language. Tr. 172.

Plaintiff also claims that although the legal definition of public domain is clear, this does "not establish what lay persons intend or understand by the use of such terms...." Pl.Mem. at 50. Ignoring the fact that it was Kemelhor's attorney who inserted the terminology, and thus any ambiguity will be construed against him, *151 West Assoc. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 734, 472 N.Y.S.2d 909, 910, 460 N.E.2d 1344, 1345 (1984), the court is not convinced that Kemelhor is an untutored lay person since he had dealt extensively with other publishers in the past.

Plaintiff contends that he "was not given any direction to minimize risk or to select photographs in accordance with a 'risk-free' or 'non-copyright' criteria." Pl.Mem. at 16. This argument fails to deal with the basic provision in the agreement which provides that it was *Kemelhor* who was obligated to provide pictures in the public domain.

The evidence adduced at trial showed that Kemelhor failed to provide Penthouse with pictures in the public domain. In fact plaintiff so stipulated:

We are quite willing to stipulate that the materials in the submissions made by Mr. Kemelhor to Penthouse were in part copyrighted materials. There has never been any dispute about that and it's freely conceded.

Tr. 201.

Immediately following this stipulation, Kemelhor admitted that a substantial number of the photographs came from

copyrighted sources. Tr. 202–03. Therefore, Kemelhor's submissions were in violation of the agreement.

Kemelhor argues that the court must not confine its analysis by simply examining the contract but rather should look at the prior drafts of the agreement. The court rejects that argument because the contract is a complete integration of all prior negotiations. *Restatement (Second) of Contracts* § 213 & comment a (1981). In addition, the court will exclude extrinsic evidence because the contract language is vested with clarity and only one reasonable interpretation can be inferred. *American Home Prod. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir.1984).

### 2. *Waiver*

Defendant claims that Kemelhor violated the agreement by failing to submit a feature each month. Def. Mem. at 14–16. There is no dispute that Kemelhor submitted only two features. Tr. 85, 90. Kemelhor claims that the agreement was modified by numerous oral statements. Tr. 105. Penthouse argues that since the agreement provides that only a writing signed by both of the parties can modify the contract, these oral statements are inadmissible to circumvent the agreement. Pl. Exh. 40, ¶ 17.

■ An employer may be estopped from asserting the right to discharge an employee for breach of contract if the employer's behavior condoned the employee's conduct. An employer's waiver may be found in its actions or words. *Hadden v. Consolidated Edison*, 45 N.Y.2d 466, 469, 410 N.Y.S.2d 274, 276, 382 N.E.2d 1136, 1138 (1978). Therefore, if Penthouse retained Kemelhor after discovery of the breach of a duty to submit monthly features which would ordinarily vest Penthouse with the right to terminate Kemelhor, it may be inferred that Penthouse condoned Kemelhor's conduct. *Fahey v. Kennedy*, 230 A.D. 156, 159, 243 N.Y.S. 396, 400, *appeal denied*, 230 A.D. 799, 244 N.Y.S. 603 (3d Dep't 1930).

■ The court finds that Penthouse's behavior subsequent to this alleged breach constituted a waiver of the right to discharge Kemelhor for not submitting monthly features. This is not a situation where Penthouse was unaware of Kemelhor's alleged delinquency and complained of it upon discovery. To the contrary, since Penthouse contends that Kemelhor's last submission was in July, it was quite aware of this purported breach. Penthouse's knowledge coupled with the complete absence of any evidence showing Penthouse communicated its dissatisfaction to Kemelhor amounted to a waiver of the right to terminate Kemelhor for this alleged breach.

### 3. *Termination of the Employment Relationship*

Even if there was ambiguity as to the requirement that the pictures be free of copyright protection, the termination clause contained in the contract limits Kemelhor's damages to three month's severance pay. Penthouse claims that the letter sent by Guccione to Kemelhor was a letter of termination. Pl. Exh. 71. Kemelhor contends that the letter was not properly sent and in any event Penthouse was not empowered to terminate the agreement because the agreement speaks of "legal problems" and not "legal risks." Pl. Mem. at 53.

#### (a) *The Governing Standards*

■ An employer has the right to terminate the employment contract pursuant to a provision therein. *Reiss v. Arabian Am. Oil Co.*, 279 A.D. 805, 109 N.Y.S.2d 625, 626 (2d Dep't 1952), *aff'd*, 304 N.Y. 953, 110 N.E.2d 888 (1953). However, an employer attempting to utilize a termination clause based on the employer's discretion must not act in a surreptitious or unreasonable fashion. *Olsen v. Arabian Am. Oil Co.*, 194 F.2d 477, 479 (2d Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 12, 97 L.Ed. 636 (1952). Moreover, an employer seeking to discharge an employee by using a clause in the contract vesting the employer with discretion must act in good faith. *Reiss*, 279 A.D. at 805, 109 N.Y.S.2d at 626. *See Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1021 (2d Cir.1985). In sum, the law requires the employer to have some

articulable reason for terminating the employee under such a provision in the contract.

### (b) *The Right to Terminate*

■ The court finds that Penthouse acted in good faith during the course of the performance of the contract. Penthouse initiated an internal investigation of the risks associated with publishing Kemelhor's submissions during the summer of 1982. Tr. 317. Immediately thereafter, Penthouse sought out the opinions of outside counsel. Tr. 318. These were reasonable steps undertaken by Penthouse to protect itself against potential lawsuits.

Kemelhor alleges that these investigations and reviews were not reasonable since HIGH SOCIETY had published some of Kemelhor's submissions in the past. Kemelhor's contention overlooks the fact that PENTHOUSE is a significantly more profitable and visible magazine than HIGH SOCIETY. Tr. 295–97.

Moreover, the entire context of the letter lends strong credibility to the proposition that Penthouse acted in good faith. The letter states in pertinent part:

> Sorry that so many problems appear to have developed out of this concept, but you will remember that I was concerned at the very outset and told you that our agreement would depend at all times on the continuing reviews, comments and advice of our lawyers.
>
> Perhaps we can find other, less dangerous ways of getting together.

Pl. Exh. 71.

Turning to Penthouse's reason for seeking to dismiss Kemelhor, the court finds it quite reasonable. Certainly Penthouse was entitled to receive marketable pictures under this contract. Since Penthouse decided that the risks were too severe in publishing them it acted on sound judgment when it terminated the employment relationship.

### (c) *The Effectiveness of the Termination*

In terms of the effectiveness of the letter sent by Guccione, Kemelhor claims that even if Penthouse had the power to terminate the agreement, it failed to follow the required procedures. According to Kemelhor, "Penthouse failed to perform each and every one of those procedural and substantive steps and thus failed to fulfill the conditions imposed on it that were prerequisites to an effective termination." Pl. Mem. at 59. Hence, he argues, Penthouse breached the agreement and is liable for the balance of his salary.

■ The court rejects Kemelhor's argument for two reasons. First, Kemelhor never denied that he in fact did receive the letter. Thus, there is no logical reason that the court should not consider the letter effective notice. Second, even if he had not received the letter, he would not be entitled to the balance of his salary. It is the law of New York that if incomplete notice or no notice is given the employer has breached the employment contract. *Bitterman v. Gluck*, 256 A.D. 336, 337, 9 N.Y.S.2d 1007, 1008 (1st Dep't 1939). However, damages for such a breach will be limited to the salary which the employee would have been entitled to had notice been properly given. "The New York courts have refused, however, to hold that failure to comply strictly with these notice requirements will result in a 'wrongful discharge' in the traditional sense." *Holt v. Seversky Electronatom Corp.*, 452 F.2d 31, 34–35 (2d Cir.1971). *See Hunter v. H.D. Lee Co.*, 563 F.Supp. 1006, 1011 (N.D.N.Y.1983); *Yarmy v. Conte*, 128 A.D.2d 611, 613, 513 N.Y.S.2d 21 (2d Dep't 1987); *Ives v. Mars Metal Corp.*, 23 Misc.2d 1015, 1017, 196 N.Y.S.2d 247, 249 (Sup.Ct.1960). Consequently, any breach on the part of Penthouse will merely require it to pay Kemelhor his full severance pay. *Holt*, 452 F.2d at 34.

### (d) *The Right to Terminate Based upon the Employee's Disloyalty*

Moreover, regardless of whether the termination letter triggered an "effective" termination, Kemelhor was in no way an employee after April 4, 1983. There is no dispute that subsequent to April 4, 1983, Kemelhor began providing exclusive services to his employer's competitors. Kemelhor signed contracts dated April 5, 1983

obligating himself to render exclusive services to HIGH SOCIETY and CELEBRITY SKIN. Def.Exhs. B, C. Kemelhor's understanding that he was no longer an employee of defendant is exemplified by the fact that his affidavit submitted in support of his suit in Maryland claimed three month's *severance* pay.

 An employee who promises to furnish exclusive services to an employer is justifiably discharged if he provides services to another. *Kurlan v. Gutman*, 90 Misc. 14, 16, 152 N.Y.S. 897, 898 (1st Dep't 1915). Surely, PENTHOUSE is in competition with both HIGH SOCIETY and CELEBRITY SKIN for a share of the profits in the adult magazine industry. An employee's acceptance of employment from interests hostile to his employer is an act of disloyalty. Even in non-exclusive employment contracts, there is an implied duty upon the employee not to compete with his employer. *Robert N. Brown Assoc. v. Fileppo*, 38 A.D.2d 515, 327 N.Y.S.2d 133, 135 (1st Dep't 1971). Disloyalty on the part of an employee justifies terminating the employment relationship. *Berg v. Just Because, Inc.*, 205 A.D. 31, 33, 199 N.Y.S. 66, 67 (1st Dep't 1923). Accordingly, the court finds that at the latest, the employment relationship was terminated on April 4, 1983.

### B. *Defendant's Counterclaim*

Turning to Penthouse's counterclaim, it seeks restitution based on Kemelhor's asserted contractual breaches. According to Penthouse, "[f]ailure of consideration is a ground for rescission of a contract...." 22 N.Y.Jur.2d *Contracts* § 464, at 406 (1982). However, in this case Penthouse is not rescinding the contract but is actually utilizing a provision contained therein to limit its liability. Restitution is an alternative to the enforcement of a contract. *Restatement (Second) of Contracts* § 373 (1981). Moreover, Penthouse has lost its right to restitution because it accepted Kemelhor's services without protest until early 1983 immediately prior to its termination of salary payments. *Id.* § 373 comment a.

## CONCLUSION

The court finds that Penthouse was entitled to marketable pictures and thus acted reasonably in terminating the employment relationship. In view of the discussion above, the court finds that Kemelhor is entitled to damages, including interest, calculated in the following manner: (1) salary from February 11, 1983 to April 4, 1983; (2) the royalty payment due September 1, 1982; (3) three month's severance pay; and (4) the return of his pictures. Kemelhor is not entitled to the balance of his salary. He must also return the photographs to Penthouse which he purchased, the cost of which was reimbursed by Penthouse. The court finds that Penthouse is not entitled to restitution.

Submit judgment in conformity herewith.