**NEW BANK OF NEW ENGLAND, N.A., Plaintiff,**

v.

**The TORONTO–DOMINION BANK, Provident National Bank, the Prudential Insurance Company of America and the Toronto–Dominion Bank Trust Company, Defendants.**

**No. 91 Civ. 0905 (RWS).**

United States District Court, S.D. New York.

July 16, 1991.

---

Hughes Hubbard & Reed (Jerry J. Strochlic, of counsel), New York City, New Bank of New England, N.A. (Kathleen C. Stone, of counsel), Boston, Mass., for plaintiff.

Mayer, Brown & Platt (Marc E. Kasowitz, of counsel), New York City, for defendants The Toronto–Dominion Bank, The Toronto–Dominion Bank Trust Co. and Provident Nat. Bank.

Wachtell, Lipton, Rosen & Katz (Steven M. Barna, of counsel), New York City, for defendant The Prudential Ins. Co.

## OPINION

SWEET, District Judge.

The defendants The Toronto–Dominion Bank ("TD Bank"), Provident National Bank ("Provident"), The Prudential Insurance Company of America ("Prudential") and The Toronto–Dominion Bank Trust Company ("TD Trust") have moved under Rule 56, Fed.R.Civ.P. for summary judgment dismissing the complaint of plaintiff New Bank of New England, N.A. ("NBNE"), one of four institutional lenders under a syndicated loan agreement (the "Credit Agreement"). For the reasons set forth below the motion is granted, and the complaint is dismissed.

*Prior Proceedings*

The complaint in this action was filed by NBNE on February 6, 1991, and the instant motion was heard and submitted on March 26, 1991.

*The Facts*

The facts as found here are, except as otherwise noted, undisputed by the parties.

NBNE is a bridge bank chartered by the Office of the Comptroller of the Currency under 12 U.S.C. § 1821(n) with its principal place of business in Boston, Massachusetts. NBNE is the successor of Bank of New England, N.A. ("BNE"), which has been placed in receivership by the Comptroller of the Currency.

TD Bank is a Canadian chartered bank with its principal place of business at Toronto, Ontario, licensed to and doing business in the State of New York with offices at 31 West 52nd Street, New York, New York. TD Trust is a New York corporation with its principal place of business at 42

Wall Street, New York, New York. Provident is a national banking association with its principal place of business in Philadelphia, Pennsylvania. Prudential is a New Jersey mutual insurance company with its principal place of business in Newark, New Jersey.

On August 25, 1988, Noble Broadcast Group, Inc. ("Noble"), the borrower, entered into the Credit Agreement with the four institutional lenders, BNE, TD Bank, Provident and Prudential (the "Lenders").

The Credit Agreement states that neither that Agreement, any Note, or any terms of the Agreement or Note may be amended, supplemented or modified "without the written consent of all the lenders" if "such amendment, supplement or modification shall (a) extend the maturity of any Note or any installment thereof, or reduce the rate or extend the time of payment of interest thereon...." (Section 13.1).

The Credit Agreement defines certain occurrences as constituting an "Event of Default." One such occurrence, defined in § 11.1(a), is that Noble:

shall fail to pay any interest or principal payment on any Note when due in accordance with the terms thereof or hereof; or [Noble] shall fail to pay any other amount required to be paid hereunder within five Business Days after any such amount becomes due in accordance with the terms hereof.

In the event of such a default, the Majority Lenders, by notice of default to Noble, "may" declare all amounts owing under the Credit Agreement and Notes immediately due and payable and, upon such acceleration, "may" enforce payment and exercise all their other rights and remedies (§ 11.1).

The term "Majority Lenders" is defined as "Lenders holding more than 50% of the aggregate unpaid principal amount of the Notes...." (§ 1 at p. 9).

The Credit Agreement also provides for the Lenders to waive an Event of Default, but specifically states at § 11.2 that "the consent of all Lenders shall be required to waive an Event of Default under Section 11.1(a)...."

Section 13.10 of the Credit Agreement specifies that California law shall govern all disputes arising under the Agreement.

At the same time that it signed the Credit Agreement, Noble pledged its stock in its subsidiaries as collateral to secure its indebtedness, by means of a Security and Pledge Agreement (the "Pledge Agreement"). In addition, one of Noble's subsidiaries pledged its rights under a sales agency agreement as collateral to secure its guaranty of a portion of Noble's indebtedness, by means of a Security Agreement (the "Subsidiary Agreement").

Also at that same time, on August 25, 1988, the Lenders along with two other creditors of Noble (collectively, the "Creditors") and TD Trust as agent for all of the Creditors entered into an Intercreditor Agreement in connection with the Credit Agreement. Among other things, the Intercreditor Agreement contained § 9(d), entitled "Limitation on Liability of Creditors to Each Other," which provided that:

No Creditors ... shall have any liability for any action taken or omitted to be taken by it or them ... in connection with the Credit Agreement ... or this Agreement (or any other documents executed pursuant thereto) except as expressly provided herein and therein.

The Intercreditor Agreement also stated that the agent, TD Trust, "shall be liable for its own gross negligence or willful misconduct." TD Trust holds the collateral which Noble and its subsidiary pledged to secure Noble's indebtedness to the Lenders.

Since August 1989, Noble and the Lenders have engaged in a series of negotiations concerning the potential restructuring of Noble's indebtedness. In connection with these negotiations, Noble and the Lenders have amended the Credit Agreement in several respects, including extending Noble's time to make certain payments. These amendments were accomplished by means of several agreements, including a Standstill Agreement, dated August 3, 1989, and an Amended and Restated Standstill Agreement, dated November 21, 1989. Both of those agreements have expired.

Noble has defaulted in making payments due under the Credit Agreement.

On October 23, 1990, BNE notified the other Lenders that Noble's failure to make payment of interest and principal constituted an Event of Default under Section 11.-1(a) of the Senior Credit Agreement and that BNE did not consent to a waiver of the default and requested the other Lenders to notify Noble of the acceleration of the loan. Thereafter, NBNE succeeded to all of BNE's rights under the Credit Agreement, the Intercreditor Agreement, the loans and notes, guarantees and related security agreements.

On January 23, 1991, TD Bank responded to the October 23 letter, informing NBNE counsel to the bank group had advised that "no significant period of time should pass without there being either (i) a waiver of defaults in effect or (ii) an acceleration of the indebtedness under the Senior Credit Agreement." The letter also stated: "enclosed for your information is a copy of a letter that Toronto–Dominion Bank, on its behalf and on behalf of Provident National Bank and The Prudential Insurance Company of America, intends to send to Noble Broadcast Group, Inc." The enclosed letter indicated that TD Bank, Provident and Prudential "hereby agree, as Majority Lenders, to refrain from declaring an acceleration under Section 11.1 of the Senior Credit Agreement as a result of the currently existing payment default thereunder." The letter stated that the agreement to refrain from accelerating was given on the understanding that Noble would continue to negotiate for a restructuring of its capital structure.

On January 24, 1991, NBNE notified TD Bank that an event of default by Noble existed and was continuing, that NBNE did not consent to any waiver of Noble's default, nor did it join in any position that might be characterized as an agreement to refrain from accelerating Noble's indebtedness.

On February 1, NBNE sent a second notice to TD Bank stating that NBNE did not consent to any waiver of Noble's default, and would not continue to participate in negotiations for a restructuring of Noble's indebtedness, and that no other lender was authorized to represent NBNE in such negotiations.

The negotiations between Noble and the other Lenders continued, and have resulted in a Summary of Indicative Terms and Conditions for the Restructuring of the Existing Senior Debt of Noble Broadcast Group, Inc., dated January 23, 1991, February 11, 1991, and March 8, 1991. This summarizes the terms the other Lenders have been proposing for a restructuring of Noble's debt; under the proposal, all of the Lenders, including NBNE, would agree to extend or negotiate the time for payment of principal, to extend the time for payment of interest, and to reduce the interest rate paid by Noble.

## Discussion

### Summary Judgment Is Appropriate

The facts as set forth above are not disputed by the parties. Because the case can be resolved as a matter of law on the basis of these facts, summary judgment is appropriate. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### The Agreements Are Not Ambiguous

■ Under the express language of the applicable agreements NBNE cannot compel the majority lenders to accelerate and foreclose.

As NBNE itself alleges:

The Intercreditor Agreement provides that the agent *may* act in certain circumstances in accordance with the directions of the majority lenders, that is, the holders of more than 50% of the unpaid debt under the Agreement. The Senior Credit Agreement contains a similar provision. For example, the Senior Credit Agreement provides that a majority of the lenders *may* require the agent to accelerate the loan upon specified events of default. Defendants TD Bank, Provident and Prudential together constitute majority lenders under both the Senior

Credit Agreement and the Intercreditor Agreement....

Complaint ¶ 14 (emphasis added).

Here, a majority of the Lenders have not directed or required acceleration or foreclosure. The discretionary language of the operative documents authorizes them to refrain from doing so.

In *Carondelet Sav. & Loan Assn. v. Citizens Sav. & Loan Assn.*, 604 F.2d 464 (7th Cir.1979), a bank that had purchased a participation in a loan alleged that the selling bank had improperly refused to foreclose upon the borrower's default. The court held that where the participation agreement "specifically granted the [selling bank] authority to determine when to foreclose," the selling bank "clearly had the authority not to foreclose." 604 F.2d at 469. While the form of the loan participation at issue in *Carondelet* differed from the syndication in this case, and while the selling bank in that case had express authority under the agreement to act on behalf of all the participating lenders, *Carondelet*, nevertheless, establishes that the discretionary power to declare a default must also include the power not to do so.

Here [the defendant] wished to modify [the loan agreement] whereas [plaintiff] favored foreclosure. Nothing in the Participation Agreement gives [plaintiff] the power to insist on foreclosure in such a situation, and we are satisfied that the authority to decide what to do was vested in [the defendant].

604 F.2d at 470; *see also In Re Yale Express System, Inc.*, 245 F.Supp. 790, 792 (S.D.N.Y.1965); *First Bank of WaKeeney v. Peoples State Bank*, 12 Kan.App.2d 788, 758 P.2d 236 (1988); *Clare v. New York Life Ins. Co.*, 178 A.D. 877, 166 N.Y.S. 95 (1st Dep't 1917).

NBNE asserts that while the agreements may not have expressly given it the right to insist on foreclosure, the explicit terms of the Credit Agreement and the Intercreditor Agreement must be interpreted as implying such a right.

■ Courts have generally refused to rewrite agreements to provide minority lenders with any rights, such as the "implied" right sought here by NBNE, which are not expressly set forth in the agreements. *See, e.g., Hibernia National Bank v. F.D.I.C.*, 733 F.2d 1403, 1408 (10th Cir. 1984); *Colorado State Bank of Walsh v. F.D.I.C.*, 671 F.Supp. 706, 707 (D.Colo.1987) (loan participation purchaser's claim against selling bank based on "implied duty to collect" on loan dismissed where claim was "contrary to the plain language of the written agreement between the banks"). Nor is there any basis for reading fiduciary or other duties into agreements "among sophisticated lending institutions." *First Citizens Federal Savings and Loan Association v. Worthen Bank and Trust Company, N.A.*, 919 F.2d 510, 514 (9th Cir. 1990). *See also Northern Trust Company v. F.D.I.C.*, 619 F.Supp. 1340 (W.D.Okla. 1985).

Indeed, to the extent that NBNE's claim against the other Lenders is premised on a purported "implied" covenant between the Lenders, NBNE has expressly waived such a claim. Section 9(d) of the Intercreditor Agreement, quoted above, specifically provides that none of the Lenders shall have any liability to each other for any action or omission in connection with, among other things, the Credit Agreement or the Intercreditor Agreement, "except as expressly provided" in those agreements. There is no question that such a limitation of liability among parties such as the lenders here is enforceable under California law. *See, e.g., Philippine Airlines, Inc. v. McDonnell Douglas Corp.*, 189 Cal.App.3d 234, 240, 234 Cal.Rptr. 423, 426 (1987); *Price v. Wells Fargo Bank*, 213 Cal.App.3d 465, 261 Cal.Rptr. 735 (1989) (affirming dismissal of borrower's claims that lending bank owed them implied duty of reasonable forbearance in enforcing creditor's remedies; "[c]ontracts are enforceable at law according to their terms").

In an effort to avoid summary judgment, NBNE has argued that the agreements must be considered ambiguous because the interpretation advanced by the moving Lenders has effectively created a stalemate: while Noble's default has not been waived, it has also not been acted upon.

NBNE asserts that this stalemate could not reasonably have been contemplated by the parties, and that this indicates that the Lenders' interpretation does not reflect the parties' intentions when the documents were signed.

NBNE's proposed interpretation is that because the Credit Agreement requires NBNE's consent to a restructuring and because it will not agree to a restructuring but, instead, prefers to accelerate and foreclose, the majority lenders are required to agree to accelerate and foreclose.

However, the document specifically provides that upon Noble's default the vote of a majority of the Lenders is required in order to exercise the remedies of acceleration and foreclosure. There is no provision in the Senior Credit Agreement for a minority lender such as NBNE to compel such an acceleration and foreclosure, and indeed, no provision which even suggests such authority.

■ Where, as here, the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation. *E.g.*, *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) ("[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation"); *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) (courts "will not torture words to impart ambiguity where the ordinary meaning leaves no room for ambiguity"); *Health–Chem Corp. v. Baker*, 737 F.Supp. 770, 773 (S.D.N.Y.1990), *aff'd*, 915 F.2d 805 (2d Cir.1990) (that parties disagree as to meaning of contractual term "does not in itself create a question of fact"); *Kemelhor v. Penthouse International, Ltd.*, 689 F.Supp. 205, 212 (S.D.N.Y.1988), *aff'd*, 873 F.2d 1435 (2d Cir.1989) ("contract will not be held to be ambiguous merely because the parties ascribe varying meanings to a specific provision); *Oriental Commercial & Shipping Co. v. Rosseel, N.V.*, 769 F.Supp. 514, 517 (S.D.N.Y.1991).

Nor should the court read an ambiguity into an agreement merely because one of the parties becomes dissatisfied with its position under the plain terms of the agreement. *E.g., United States v. 0.35 Of An Acre Of Land, Westchester County*, 706 F.Supp. 1064, 1070 (S.D.N.Y.1988) ("where the language chosen contains no inherent ambiguity ... courts are hesitant, under the guise of judicial construction, to imply additional requirements to relieve a party from an asserted disadvantage following from the terms used"); *Libra Bank Limited v. Banco Nacional De Costa Rica, S.A.*, 570 F.Supp. 870, 893 (S.D.N.Y.1983) ("where there is no inherent ambiguity, courts should not ... reach an artificial interpretation in order to relieve a party from an improvident bargain").

All of the circumstances indicate that the parties to these agreements were sophisticated institutions, dealing with the central issues of their business. As such, there is no basis to presume that they intended a result other than that required by the language of their agreements—stalemate or not.

In addition, NBNE's assertion that the Majority Lenders have an "implied obligation of good faith" to accelerate and foreclose is barred by § 9(d) of the Intercreditor Agreement and Section 12.1 of the Credit Agreement, which states with respect to TD Trust:

> no implied covenants, functions, responsibilities, duties, obligations or liability shall be read into this Agreement or otherwise exist against the Funding Agent.

In each of the cases cited by NBNE in support of this claim of "good faith obligation," the party alleged to have breached the implied duty of good faith either wrongfully exercised some contractual power to its exclusive benefit or wrongfully denied the existence of a contractual obligation, again to its exclusive benefit. Here there is no allegation that the other Lenders have acted in a fashion intended to benefit themselves at NBNE's expense, but only that the two sides disagree on which

course of action will produce a better recovery on the troubled loan.

Thus, NBNE has no "right" to accelerate, nor is there any "promise" to accelerate. Acceleration is a remedy that can only be provided by—and exercised in accordance with—contract. *See, e.g., Quick v. American Steel and Pump Corp.,* 397 F.2d 561, 564 (2d Cir.1968); *Minor v. Minor,* 184 Cal.App.2d 118, 7 Cal.Rptr. 455 (1960) (absent acceleration clause in contract, future payments will not be accelerated). The agreement here does provide for the remedy, but only where it is approved by a majority of the Lenders.

Nevertheless, although acceleration and foreclosure are contractual remedies which may not be exercised without a majority vote of the Lenders, NBNE is free to pursue its own remedies at law by suing Noble to collect on its debt to NBNE. Section 13.3 of the Senior Credit Agreement provides in pertinent part:

> The rights, remedies, power and privileges herein provided are cumulative and not exclusive of any rights, powers and privileges provided by law or in equity.

*See also In re Egbe,* 107 B.R. 711, 714 (Bankr. 9th Cir.BAP 1989) (under California law, contractual remedies are cumulative).

In summary, the language of the controlling agreements is unambiguous and no implied obligation can be constructed, impasse or no. Thus the first and second causes of action must be dismissed.

*Adherence To The Terms Of The Agreements Does Not Constitute Negligence Or Wilful Misconduct*

With respect to NBNE's third claim, for negligence or wilful misconduct, the defendants again rely upon § 9(d) of the Intercreditor Agreement, which provides that no creditor "shall have any liability ... except as expressly provided herein." Although such an exculpatory provision is to be strictly construed under California law, *Philippine Airlines v. McDonnell Douglas, supra,* 189 Cal.App.3d at 237, 234 Cal.Rptr. at 424, even a strict construction of this language furnishes a defense to the Lender defendants here.

As for TD Trust, although Section 7(a) of the Intercreditor Agreement provides that the agent "shall be liable for its own gross negligence or wilful misconduct," the misconduct alleged is the failure of the Lenders other than NBNE to declare a default, rather than TD Trust's failure to act upon such a declaration. Since no duty is owed to NBNE to declare a default, the failure to make such a declaration does not constitute negligence. Therefore the third cause of action must be dismissed.

*Conclusion*

Based upon the facts and conclusions set forth above the motions of the defendants are granted and the complaint dismissed. Enter judgment on notice.

It is so ordered.