**CARONDELET SAVINGS & LOAN ASSOCIATION, Plaintiff-Cross Defendant-Appellant,**

v.

**CITIZENS SAVINGS & LOAN ASSOCIATION, Defendant-Cross Plaintiff-Appellee.**

No. 78-2119.

United States Court of Appeals, Seventh Circuit.

Argued May 24, 1979.

Decided Aug. 3, 1979.

5. The defendant also could have been fined $15,000.

**466**

Marvin Klamen, Clayton, Mo., for plaintiff-cross defendant-appellant.

Patrick M. Flynn, Belleville, Ill., for defendant-cross plaintiff-appellee.

Before CUMMINGS, Circuit Judge, PECK, Senior Judge,* and PELL, Circuit Judge.

---

* Hon. John W. Peck, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

1. The plaintiff is a Missouri corporation and the defendant is incorporated pursuant to the Illinois Savings and Loan Act. This diversity action was originally brought in a federal district court in Missouri but was transferred to the Federal District Court for the Eastern District of Illinois.

2. At oral argument, counsel for Carondelet stated that this amount was the face amount of the participation interest purchased by Carondelet. He conceded that to the extent Carondelet has been paid pursuant to the participation agreement or the foreclosure, the amounts paid should reduce the amount of damages claimed.

3. The case was consolidated with one in which Citizens sued Carondelet for money due it un-

CUMMINGS, Circuit Judge.

On October 14, 1965, defendant Citizens Savings & Loan Association (Citizens) sold plaintiff Carondelet Savings & Loan Association (Carondelet) a 35% interest in a certain loan and the parties entered into a loan participation agreement which provided that Citizens was to service the loan. Citizens foreclosed on the real estate securing the loan in May 1973 and at the same time Carondelet sued Citizens for breach of fiduciary obligation and breach of contract.[1] Claiming that Citizens should have foreclosed sooner and should not have agreed to certain modifications of the loan, Carondelet sought damages of $431,597.81[2] or, in the alternative, rescission of the purchase and the participation agreement.[3]

After a full trial, Judge Foreman held that the plaintiff had failed to establish any breach of fiduciary obligation or breach of contract and entered judgment for the defendant. We affirm.

### Facts

During the summer of 1965, Cherry Realty, Inc., a Delaware corporation doing business in Illinois, negotiated with Citizens for a loan for the construction of the Pyramids Dormitory, a student dormitory in Carbondale, Illinois. Based in part on an appraisal indicating that the building would be worth

der another participation loan agreement in which Carondelet was the seller and Citizens the buyer. Apparently after the principal suit was filed Carondelet began to withhold payments to Citizens, asserting a right of set-off. The parties stipulated that the amount due in the suit brought by Citizens was $121,899.32 and judgment was entered against Carondelet for that amount. Although Carondelet has also appealed that judgment, the issue was not briefed or argued. Liability appears to be conceded, and we can only surmise that the purpose for the appeal was to assert the right of set-off if we reversed the judgment for Citizens in the principal suit. Since instead we affirm that judgment there is no occasion to consider the asserted right of set-off. The judgment for Citizens in its suit against Carondelet will be affirmed without further comment.

$2 million, Citizens agreed to loan $1.4 million with interest at 6¼ for 20 years. Carondelet agreed to purchase a 35% interest in the loan, and Bohemian Savings & Loan Association (Bohemian) agreed to purchase another 35% interest. Bohemian, like Carondelet, is a Missouri corporation, but it is not involved in this lawsuit. Citizens retained the remaining 30% interest in the loan.

On September 23, 1965, Citizens executed the agreed-upon loan to Cherry Realty, Inc. and took back a promissory note and a mortgage on the dormitory. On October 1, 1965, Cherry Realty, Inc. conveyed the property to Rawlings Dormitory Trust, an Illinois land trust. On October 14, 1965, Carondelet purchased its 35% interest in the loan and entered into a participation agreement that provided for Citizens to service the loan,[4] retaining a fee of ¼ of 1% for doing so. On September 1, 1966, Rawlings Dormitory Trust merged with another Illinois land trust to form Investors Land Trust (Investors). Subsequently, on February 12, 1968, Cherry Realty, Inc. was dissolved and on February 27, 1968, the shares representing beneficial interests in the newly created Investors Land Trust were registered with the Illinois Secretary of State.

Apparently the loan presented no problems until December 10, 1969, at which time the manager of the property[5] requested a modification of the loan terms because of a drastic downturn in the demand for student dormitory space.[6] The manager asked for an advance of ten months' interest payments, to be held by Citizens and applied to monthly payments as they became due and for an extension of the loan term from 20 to 25 years. This request also applied to a number of dormitories held by Investors to which Citizens had made loans. Citizens held a 50% interest in the loans on these other dormitories, and Carondelet was not involved in them.

In response to the loan modification request, Citizens called a meeting of the loan participants. Although Bohemian apparently did not object, Carondelet objected to the advance or any modification in terms and advocated foreclosure. Citizens concluded that the loan should be modified, but because of Carondelet's resistance to making an advance, the payment schedule was instead modified effective February 27, 1970, to reduce the monthly payments of $10,233 to $8,443. The loan again became delinquent in the summer of 1971, when payments for the months of July, August and September were missed. In October 1971, Citizens loaned $120,000 to Investors in return for a second mortgage on Washington Square, a dormitory which was held by the trust. Washington Square Dormitory was then under a contract of sale to the University. The proceeds of this loan were used to bring the payments on the Pyramids Dormitory up to date and to convert some of the rooms in Pyramids into efficiency apartments.[7]

4. The parties agree that servicing a loan includes collecting the monthly payments from the debtor and distributing the pro-rata amounts to the participants. The participation agreement also provided that Citizens could foreclose on the mortgage in the event of default. Whether Citizens' forbearance from foreclosure and its granting of certain loan modifications are included in its power to service the loan is the subject of this suit.

5. The Pyramids Dormitory, as well as additional dormitories, was managed by Plains Leasing Company, Inc., which received 5% of the gross income from the properties for its services. A majority of the stock of Plains Leasing was held by James A. Cherry and Charles T. Goss, who were also the sole shareholders of Cherry Realty Company, Inc. (Ex. 25, pp. 11–12).

6. The reasons for the downturn in the dormitory market apparently were declining enrollment at Southern Illinois University and relaxed requirements on the part of the University, allowing students to live in housing that was not University-approved.

7. Carondelet insists that this additional loan by Citizens to Investors indicates that Citizens was manipulating loans it was involved in to its advantage at the expense of Carondelet. Although as discussed more fully below we do not accept Carondelet's characterization of Citizens' bad faith, neither do we accept Citizens' description of this transaction as a voluntary weakening of its position in another loan in an altruistic attempt to aid Pyramids. Since the Washington Square Dormitory was already under a contract of sale to the University and the

Even more serious problems were encountered with the loan in early 1972. Carondelet objected to any further modification but did not attend meetings of the loan participants to determine a course of action. Citizens and Bohemian agreed to grant a moratorium of all payments on the loan for the 8 months from April 1, 1972, until December 1, 1972, to reduce the monthly payments further to $7,875, and to segregate the income from Pyramids from the other income of Investors.[8] Nevertheless, the December 1972 payment was not made and soon thereafter Citizens proceeded to foreclose.

Carondelet then brought this action, alleging, as indicated, that Citizens' granting of the modifications and refusal to foreclose earlier constituted a breach of fiduciary obligation or a breach of the loan participation agreement. Carondelet sought damages in the face amount of its participation interest on the theory that its interest had been converted by Citizens. In the alternative, it sought to rescind the purchase and the participation agreement. The district court held that there had been no breach by Citizens of either the fiduciary relationship or of the contact. We agree.

Judge Foreman acknowledged that Citizens was a dominant fiduciary, but concluded that under Illinois law the burden of proving breach of fiduciary duty shifts to the defendant only after the plaintiff has demonstrated both the defendant's dominance and that the defendant benefitted at the expense of the plaintiff. The court concluded that Carondelet had demonstrated neither that Citizens profited from its fiduciary relationship nor that Citizens had breached the duty of care to which a fiduciary is held.

■ On appeal, Carondelet urges that Judge Foreman erred in not shifting the burden of proof to Citizens. The cases cited in support of this argument recognize that the burden of proof shifts "wherein the dominant party [is] profited." *Boryca v. Parry*, 24 Ill.2d 320, 327, 181 N.E.2d 124, 127 (1962). Thus the question becomes whether Judge Foreman erred in concluding that Carondelet had failed to show that Citizens benefitted from the relationship. Carondelet first suggests that the ¼ of 1% service fee retained by Citizens constitutes such a benefit. However, such a fee, freely negotiated between commercial lenders, is not a benefit of the sort that shifts the burden of proof to the defendant. *Brown v. Commercial National Bank of Peoria*, 42 Ill.2d 365, 369, 247 N.E.2d 894 (1969). There was no conflict of interest between collecting this small fee and acting in the best interests of the loan participants, especially since Citizens itself retained a 30% interest in the loan.

■ Second, Carondelet asserts on appeal that

"[t]he evidence clearly showed that Carondelet's loan participation remained unpaid while Citizens, on other loans to which Carondelet was not a participant, was being concurrently repaid. Citizens received benefit from its manipulations of the collections and servicing" (Br. 37).

No citation to the record is provided in support of this assertion. Judge Foreman found that

"[i]t is clear that Citizens attempted to make this project a financial success.

\* \* \* \* \* \*

Reasonable collection methods were followed by Citizens" (App. 5, 8).

Our own review of the record fails to substantiate Carondelet's claim that Citizens manipulated various loans to its own advantage.[9] Thus, we agree with Judge Foreman

---

amount loaned approximated the difference between the contract price and the first mortgage, it does not appear that Citizens incurred any real risk in making the additional loan.

8. Apparently it was felt that Pyramids was generating more income than the other properties of the trust, and by segregating that in-

come stream it was hoped that the Pyramids loan could be protected.

9. Carondelet attempted to establish that other loans to Investors, in which Citizens had retained a 50% interest, were paid down more than the Pyramids loan. However, the record does not establish that the circumstances of those other loans were so similar to the Pyra-

that under Illinois law Carondelet has failed to shift the burden of proof to Citizens.

■ We also agree that Carondelet has not demonstrated that Citizens breached its fiduciary duty by failing "to exercise the care and prudence which ordinary men would exercise under like circumstances in dealing with their own affairs" (App. 5). Judge Foreman specifically found that Citizens' collection efforts were reasonable at the time. We cannot say that he erred in this conclusion. On appeal, Carondelet urges a number of specific instances in which Citizens allegedly acted or failed to act in such an unreasonable manner as to demonstrate either a breach of fiduciary duty or a breach of any authority delegated under the contract to Citizens to modify the loan terms. These assertedly wrongful actions will be discussed below, but we are convinced that none of them, singly or in the aggregate, justifies a reversal of the district court's judgment.

*No Breach Of Contract Has Been Shown*

Carondelet also argues that Citizens' modifications of the loan without its consent constituted a breach of contract. Specifically, Carondelet asserts first that Citizens had no authority under the participation agreement to do anything other than collect and disburse funds. In the alternative, Carondelet asserts that if Citizens did have some authority to modify the loan, it was limited to sound servicing practices. Certain actions assertedly departed so far from this standard as to constitute a breach of contract. Carondelet's objections to specific actions will be considered in the next section of this opinion. The focus here will be on the scope of Citizens' authority under the participation agreement.

Citizens relies on Paragraph VIII of the Loan Participation Agreement, which provides in relevant part that

"[i]t is agreed that the exclusive right to decide how to service such loans and what

to do and how to do it and * * * when to foreclose * * * is hereby vested in the Seller [Citizens]. The Buyer shall not be authorized to give directions to the Seller in connection with these matters."

■ Citizens claims that the authority to service the loan granted in Paragraph VII encompassed all of its challenged actions—most importantly the two modifications granted in 1970 and 1972, the permission to convert the dormitories into efficiency apartments and forebearing from foreclosure until May 1973. Carondelet, on the other hand, asserts that "servicing" includes only collecting and disbursing the loan proceeds and that Citizens was obligated to foreclose when the loan first went into default. This obligation is said to be based on Paragraph VI of the Loan Participation Agreement, which provides

"In the event of the inability of the Seller to collect any of said loans after exercising reasonable efforts to do so, Seller agrees to give prompt notice to Buyer, and to proceed to foreclose the same * * *."

Judge Foreman held that "[t]he participation agreement imposed no obligation upon Citizens to immediately foreclose upon default" (App. 7). We agree. Foreclosure was required only after exercising reasonable collection efforts. Moreover, Paragraph VIII (quoted *supra*) specifically granted the Seller authority to determine when to foreclose. Thus Citizens clearly had the authority not to foreclose. The remaining question—whether its forbearance was reasonable in the circumstances—will be discussed later.

With regard to whether "servicing" includes the kinds of modifications to the loan and collateral that Citizens authorized, neither party has cited a case directly on point, nor has our own research disclosed one. *Carondelet* relies on *Board of Commission-*

mids loan as to suggest that the different results were caused by manipulation. Furthermore, since Citizens lost almost as much as Carondelet on the Pyramids loan, it is not clear that such manipulation would have been in

Citizens' interest. This is especially true since Citizens' stake in the other loans approximated or was less than its stake in the Pyramids loan (depending on which of the other loans are considered comparable to Pyramids').

ers of *Shawnee County v. Cook*, 141 Kan. 677, 42 P.2d 568 (1935), but as Citizens points out, there was no participation agreement in the *Cook* case. Therefore it can shed no light on the proper interpretation of the agreement before us.[10] Citizens relies on treatises which specify that loan modification is included in the servicing function. While this may very well be so for a loan wholly owned by the association servicing it, it is not clear that this broad definition applies generally to participation interests owned by others.

■ However, we agree with Judge Foreman that the participation agreement in this case permitted the kinds of modifications allowed by Citizens, even over Carondelet's objections. Although inartfully drafted, the agreement as a whole clearly intended to grant a great deal of discretion to the seller/servicer. While the agreement does not say *in haec verba* that the Seller may modify the loan term or collateral, the term "servicing" is sufficiently ambiguous as to make admissible the evidence put on by Citizens to show custom and usage in the industry. Citizens' expert witnesses testified that in their opinion "servicing" would include the kinds of modifications at issue here, even in a participation loan. In the context of this testimony and the treatises cited by Citizens, it seems likely that if it were intended to limit the power of the servicer to modify the loan, this would have been done expressly.

The canon of contract construction that requires an agreement to be read strictly against the party that wrote it is not help-

ful here, since the agreement was a form contract put out by the United States Savings and Loan League. Prior to the 1970 loan modification, when Carondelet had voiced its objection to a further advance or to extension of the term of the loan, Citizens sought the advice of the Savings and Loan League as to whether the proposed modifications were permissible under the form agreement. The Assistant Counsel for the League responded affirmatively, noting that the "form was designed to 'vest complete decision-making power in the seller-servicer' as to servicing advances and collection * * *" (App. 60).[11]

■ Moreover a practical construction of the participation agreement favors Citizens' interpretation. Although an institution acting as an agent in servicing a loan wholly owned by another might not have the implicit power to modify the loan without the owner's consent, it is manifest that in the context of a participation agreement some party must have the authority to decide whether to modify or to foreclose. Here Citizens and Bohemian, holding interests aggregating 65%, wished to modify whereas Carondelet favored foreclosure.[12] Nothing in the Participation Agreement gives Carondelet the power to insist on foreclosure in such a situation, and we are satisfied that the authority to decide what to do was vested in Citizens.

### Citizens' Actions Were Not Unreasonable

■ Carondelet has objected to a whole series of decisions taken by Citizens, urging that they demonstrate either bad faith or

---

**10.** The holding of the *Cook* case was that the owners of participation interests could state a cause of action against the seller/servicer. There is no question in the present case but that the plaintiff has stated a proper cause of action. The problem is that it has not proved its case. The *Cook* case does not help because it never reached the merits, because there was no participation agreement to construe, and because there the seller/servicer retained no interest in the loan.

**11.** In the context of the inquiry to which this letter was a response, it is clear that "servicing" was understood by the League's Assistant

Counsel to include modification by extension of the term of the loan (App. 61–62).

**12.** Carondelet suggests that a deadlock could be prevented by recourse to Paragraph V of the Participation Agreement, which provides in part:

"In the event of default Seller, at its option, but without obligation to do so may repurchase from Buyer its participation interest in such loan at the then balance."

This, however, cannot solve the deadlock problem when—as must often be the case—the seller does not wish to purchase an additional interest in a loan that is in default.

such commercially unreasonable behavior as to establish a breach of the fiduciary's duty of care or a breach of the contractual obligation to service the loan "consistent with good mortgage practice" (Paragraph V of Loan Participation Agreement). Many of the actions objected to by Carondelet were found by Judge Foreman to be reasonable collection efforts and servicing of the loan consistent with good mortgage practice, since circumstances dictated that "an attempt be made to salvage the loan as a going business as opposed to immediate foreclosure" (App. 6). Judge Foreman specifically found that the reduction of payments and extension of term granted in 1970, the permission to convert part of the building to efficiency apartments, the permission to the debtor to withhold payment of escrow funds for taxes and insurance, and the granting of an eight-month moratorium on payments in 1972 all were reasonable under the circumstances.[13] We are convinced that the evidence supports these conclusions.

On appeal, as well as re-arguing at length the conclusions specifically reached by the district court, Carondelet emphasizes certain other instances that assertedly demonstrate Citizens' bad faith or unreasonable business judgment. Carondelet asserts, for instance, that "Citizens received benefit from its manipulation of the collections and servicing" (App. 37). As we have already indicated, the record does not disclose that

such manipulation was established.[14] Similarly, Carondelet speculates that "[t]he Pyramids project may well have been thus viewed [by Investors] as a highly leveraged tax loss, rather than a long term investment * * *" (Br. 12). The record is devoid of support for this charge.

Sufficient explanation was given for other actions by Citizens to rebut Carondelet's charges that they were unreasonable. There was, for instance, testimony that asserting control over the income stream (rents) would have been very difficult in a student dormitory situation (Tr. 60). Similarly, a $40,000 disbursement to the beneficial owners of the land trust in early 1969 out of 1968 income could not have been prevented because the loan was current at that time (Tr. 335). The $22,899.98 that was left in the Pyramids account at the end of 1972 and apparently never recovered was said to be necessary for operating expenses.

Only two of the objections pressed by Carondelet on appeal warrant extended consideration, and we conclude that they too were reasonable responses to the circumstances. First, Carondelet asserts that Citizens had no power to grant a moratorium of payments because under the Illinois Savings and Loan Act (Illinois Rev.Stat. ch. 32 § 796(a)), such a moratorium can be granted only if certain conditions are met, and can only be granted for payments of principal.[15] It is undisputed that the condi-

13. The circumstances included the fact that there were as many as 12 dormitories on the market in Carbondale during the years in question and that Citizens thought it important to keep Pyramids operating and at least partially occupied to avoid vandalism (Tr. 290–291, 355).

14. See note 8 supra. Carondelet appears to suggest that such manipulation was shown in part "in denying modification to other loans but granting modification to the Pyramids loan, on February 20, 1970 * * *" (Br. 7). Yet the testimony was clear that the advances sought on the other loans at that time were granted, and that the Pyramids loan was instead modified to reduce the monthly payments and extend the term because of Carondelet's objection to making an advance (Tr. 342).

15. Section 796(a) provides:

"*Extension and Modification Agreements*
(a) When the balance of a loan being repaid

under the direct reduction of principal plan does not exceed forty per cent (40%) of the value of the security therefor, and the loan has been reduced by periodical payments over a period of not less than three (3) years to the extent that the unpaid balance does not exceed fifty per cent (50%) of the amount originally secured, the board of directors may agree in writing with the borrower that for a period not to exceed three (3) years, no payments need be made on the unpaid principal amount of the loan; and the loan contract and the security instrument shall not be prejudiced by the making of such extension agreement, even if such an extension was not provided for in the loan contract. However, interest or interest and premium, taxes, assessments, insurance premiums, and other charges which the borrowing member is obligated to pay, shall be paid when due either to or for the benefit of the association."

tions set out in Section 796(a) were not met, and that the moratorium extended to payments for interest, taxes and insurance, as well as for repayment of principal. Citizens contends that the authority granted to an association in Section 796(b) "to modify, in any manner not inconsistent with the provisions of this Act, the terms of a loan as to the amount, time, or method, of the payments to be made, the interest rate, and any other provision of the loan contract * * *" allows it to grant a moratorium even though the conditions of Section 796(a) are not met. Although there appears to be no Illinois authority interpreting these Sections, we think the proper construction of the statute clearly is that Section 796(b) allows savings and loan associations freely to modify loans except with respect to "extensions" as that term is used in Section 796(a). "Extensions" in that subsection clearly means deferrals of payments, or what Carondelet has called a moratorium. Such extensions are allowed only when the conditions set out in Section 796(a) are met. Moreover, it is well established that Illinois savings and loan associations have only those powers granted by law (*Africani Home Purchase & Loan Association v. Carroll*, 267 Ill. 380, 391, 108 N.E. 322 (1915); *Fritze v. Equitable Building & Loan Society*, 186 Ill. 183, 57 N.E. 873 (1900)) so that the fact that the language of Section 769(a) is permissive rather than prohibitive does not help Citizens.

■ The fact that a savings and loan association could not in ordinary circumstances legally grant a moratorium of the sort involved here does not mean, however, that Citizens was in breach of Illinois law, its fiduciary obligations or the contract. The Illinois Savings and Loan Act also provides associations substantial salvage powers.[16] Examinations of Citizens by the Illinois Savings and Loan Commissioner both prior to and after the Pyramids loan had been foreclosed did not indicate any objection to the handling of the Pyramids loan (Ex. 78, 88, 90, 91). Moreover, Judge Foreman specifically recognized that Citizens was attempting to salvage the loan. In this circumstance we do not consider the limitations of Section 796(a) apply to deprive Citizens of the power to take the action it reasonably believed to be in the best interests of itself and the other loan participants.

■ Finally, Carondelet insists that Citizens exculpated various persons and assets from recourse on the loan. It has developed two separate theories of exculpation. First, it asserts that since Cherry Realty, Inc. originally signed the note, its assets would have been available to satisfy the loan. Assertedly some distributions were made to the shareholders on dissolution, and under Delaware law the corporate liability could, to the extent of such distributions, be asserted against the shareholders for up to three years after the corporation was dissolved. Since the corporation was dissolved in February 1968, theoretically Citizens could have proceeded against the shareholders if it had instituted foreclosure proceed-

---

16. Ill.Rev.Stat. ch. 32 § 708 provides
"An association also shall have any power conferred on a corporation by the Business Corporation Act, and any power not prohibited by law, which is reasonably incident to the accomplishment of the express powers conferred upon the association by this Act."
Similarly, Ill.Rev.Stat. ch. 32 § 706, entitled "General corporate powers," provides:
"An association operating under this Act * * * shall have all of the specific powers conferred by this Act in addition thereto, the following general powers:
 * * * * * *
(c) [A]ll of the powers granted to a savings or thrift institution organized under the laws of the United States * * *."

Savings and loan institutions chartered by the federal government are granted broad salvage powers. For example, the bylaws prescribed by regulation for federal savings and loan associations state that
"The board of directors shall have power
 * * * * * *
(d) To extend leniency and indulgence to borrowing members who are in distress and generally to compromise and settle any debts and claims."
12 C.F.R. § 544.5.7.

ings before February 1971. Yet during this time Citizens modified the loan in 1970 and loaned an additional $120,000 in 1971, part of which was used to make delinquent monthly payments.[17] Through these maneuvers, Carondelet asserts, Citizens exculpated Mr. Cherry and Mr. Goss, the sole shareholders of Cherry Realty, Inc. There is, however, no evidence in the record which would show that Citizens' actions during the years in question were other than good faith attempts to rehabilitate the loan. Moreover, there was undisputed testimony by Citizens' President, Mr. Dunck, that the note was signed by Cherry Realty, Inc. only so that the corporation could waive the privilege of redemption in the mortgage (Tr. 414, 416). He testified in addition that Carondelet was clearly informed that the security would immediately be transferred to a land trust,[18] that no one would be personally liable and that the sole source of satisfaction for the debt would be the building itself (Tr. 311, 312, 383–384, 419, 424). We therefore cannot conclude that Citizens exculpated the shareholders of Cherry Realty, Inc.

▮ Carondelet's second theory is that after Pyramids Dormitory was transferred from Rawlings Land Trust to Investors Land Trust, all of the assets of the latter trust (though not the personal assets of the beneficiaries) became available to satisfy the Pyramids debt.[19] The 1972 modification, however, specifically provided that no other assets of the merged trust could be reached by the lenders (Ex. 69). Carondelet's theory that but for this provision the other assets of the trust would have been reachable is based on three facts: (1) the February 1968 registration of the shares resulting from the merger of the land trusts stated that "[t]he trustee of the new merged trust * * * shall assume and agree to pay all existing and outstanding obligations and debts in connection with such land * * * as are transferred to him as Trustee" (Ex. 25, p. 14); (2) the income from all of the properties held by the merged trust was commingled; and (3) a letter to Citizens from its counsel prior to consummation of the 1972 modification assumed that the other assets of the merged trust could be reached if the Pyramids Loan was foreclosed. However, Mr. Dunck, President of Citizens, unequivocally testified that it was never intended that assets held by the merged trust other than the Pyramids Dormitory would be available to satisfy this particular debt. Carondelet put on no witnesses to rebut this version of the original understanding even though Mr. Tarter, who as Carondelet's then-president negotiated the purchase of the participation, was still a member of Carondelet's board and apparently available. The language quoted above from the registration statement is consistent with Mr. Dunck's position that it was intended to assure merely that the merged trust took the property subject to the mortgage. The commingling of the income from the various properties held by the trust does not demonstrate that the properties themselves were available to satisfy the Pyramids debt. It apparently was thought at first that the income from the other properties would help to meet the monthly payments on the Pyramids loan. When it was determined

**17.** The 1971 transactions could not have exculpated the shareholders of the dissolved corporation because by plaintiff's own theory the statute of limitations would have barred an action against them after February 1971. The objected-to advance did not occur until October 1971.

**18.** In fact, the land was transferred to the Rawlings Dormitory Land Trust before Carondelet purchased its participation interest.

**19.** The Rawlings Dormitory Trust was merged with a preexisting trust which held eight properties. The beneficiaries of both trusts were substantially identical. Although this merger was anticipated at the time the loan was negotiated, there is no suggestion that the purpose of the merger was anything other than convenient and economical trust management. It would be contrary to the interests of the trust beneficiaries to put all of the properties held by the merged trust at risk on the Pyramids loan. Had this been the intended result of the merger, it would presumably have been at the behest of the lenders. Yet nothing in the record suggests that the lenders sought out the merger to protect themselves.

that the income from Pyramids might in fact be the most reliable in the trust, this income stream was required to be segregated (Ex. 69). In light of Mr. Dunck's unrefuted testimony, the fact that counsel to Citizens assumed in April 1972 that other assets of the merged trust would be available in foreclosure cannot be controlling. The specific disclaimer in the subsequent modification agreement is as consistent with an attempt to clarify this apparent misunderstanding as it is with an exculpation of otherwise available assets.

All of the testimony regarding whether there was any unauthorized exculpation was before Judge Foreman. Although he did not address the question specifically, it was implied in his conclusions that there was no exculpation. Our independent examination of the record reveals no reason to upset this or any other of the district court's conclusions.

For these reasons, the judgments appealed from are affirmed.