USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-1682 DEN NORSKE BANK AS, Plaintiff, Appellant, v. THE FIRST NATIONAL BANK OF BOSTON, ET AL., Defendants, Appellees.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge] ___________________  ____________________ Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________  ____________________ Glen Banks, with whom Steven C. Koppell and Fulbright & Jaworski, __________ _________________ _____________________ LLP, were on brief for appellant. ___ Joseph L. Kociubes, with whom Mark W. Batten and Bingham, Dana & __________________ ______________ _______________ Gould were on brief for appellees. _____  ____________________ February 2, 1996  ____________________ CYR, Circuit Judge. Plaintiff Den norske Bank AS ("Den CYR, Circuit Judge.  _____________ norske") appeals from a district court order granting summary judgment to defendant First National Bank of Boston ("First National")1 on its claims for breach of contract and breach of fiduciary duty. We vacate the judgment. I I BACKGROUND BACKGROUND __________ In 1985, First National loaned $43.2 million to Glades Roads Associates ("Glades Roads") to construct an office building in Florida, and took a first mortgage on the Project. In 1986, appellant Den norske entered into a Loan Participation Agreement ("Agreement")2 with First National. Den norske purchased approx- imately 17% (or $7.5 million) of the Glades Roads loan. First National retained an 83% interest in the loan, and served as "Principal" the party charged with administering the loan.  The Agreement also provided, in pertinent part: 11. Approval of Principal's Actions. Principal ________________________________ [First National] agrees that it shall not without prior ___ _______ _____ written agreement by all Participants: (1) reduce the _______ _________ ______ ___  ____________________ 1References to "First National" include its predecessor, BancBoston, and references to "Den norske" include its predeces- sor, DnC America Banking Corp. 2"In a typical [loan participation arrangement], one bank  the 'lead bank' first makes the loan agreement with the borrower and then makes a separate agreement the participation agreement with other banks, to which the lead bank sells shares in the loan (usually retaining a share for itself, howev- er), evidenced by participation certificates. The result is that only the lead bank has a direct contractual relationship with the borrower." First Nat'l Bank of Louisville v. Continental Ill. ________________________________ ________________ Nat'l Bank & Trust Co. of Chicago, 933 F.2d 466, 467 (7th Cir. ___________________________________ 1991). 2 amount of the Loan principal or interest payments; (2) ______ __ ___ ____ _________ reduce the Loan interest rate; (3) postpone for a period of more than 60 days any due date for payment of the Loan principal; (4) release or subordinate any of the collateral or waive any claim against any guarantor or person who may be secondarily liable who would have a material, adverse effect on the collection and en- forcement of the Loan or the Loan documents; (5) sus- pend the accrual of Loan interest. In other matters concerning the routine adminis- __ _____ _______ __________ ___ _______ ________ tration of the loan, [First National] agrees not to _______ __ ___ ____ deviate from the Loan Documents unless the majority (dollars outstanding) of the lending institutions agree to the change provided [First National] is in the majority. In all cases where a consensus cannot be reached on matters of administration that is acceptable to [First National], [First National] agrees to adhere ______ to the Loan Documents. In all cases pertaining to default, [First Nation- __ ___ _____ __________ __ _______ _____ _______ al] agrees to adhere to [Section] 13.  __ ______ __ ______ __ _______ __ . . . . 13. Loan Default Procedures. [First National] ________________________ and Participants agree that in case of default, courses _______ of action will be agreed to by a majority (dollars __ ______ outstanding) of the lending institutions providing [First National] is in the majority. In cases where a consensus cannot be reached on matters pertaining to default that is acceptable to [First National], then [First National] agrees to adhere to the Loan Documents ______ for all appropriate remedies. . . . (Emphasis added.) In July 1991, Glades Roads defaulted on the note. At the time of the default, First National still held its 83% interest in the note; Den norske 17%. First National invoked the acceleration clause, made demand for the entire outstanding loan principal and accrued interest, then commenced foreclosure proceedings. In September 1991, however, First National asked Ernst & Young to evaluate the comparative benefit to First National of (i) an immediate foreclosure and (ii) a negotiated loan restructuring agreement whereby Glades Roads would make an 3 immediate payment of $8 million and a five-year balloon payment of $17 million, and First National in turn would "forgive" $9.6 million. Valuing the Glades Roads project at $24.7 million, Ernst & Young recommended restructuring rather than foreclosure. Den norske, believing that the Project was worth far more, preferred to foreclose, hold the property for five years, and collect rental income. First National rejected the Den norske proposal and opted for its own five-year restructuring plan. In 1992, Den norske brought this diversity action against First National in federal district court, alleging that First National's failure to obtain "prior written agreement by all Participants" with the Glades Roads loan forgiveness arrange- ment, pursuant to 11 of the Agreement, supra pp. 2-3, consti- _____ tuted breach of contract, breach of fiduciary duty, and an unfair trade practice. The district court initially denied cross- motions for summary judgment, finding 11 and 13 of the Agree- ment ambiguous. Den norske Bank AS v. First Nat'l Bank of ____________________ _____________________ Boston, 838 F. Supp. 19 (D. Mass. 1993).3  ______ Following discovery, however, the court reconsidered, eventually awarding summary judgment to defendant First National on the remaining Den norske claims. Den norske Bank AS v. First __________________ _____ Nat'l Bank of Boston, No. 92-11294-NMG, 1993 WL 773796 (D. Mass. _____________________ May 24, 1995). The court concluded that 11 unambiguously entitled Den norske to veto a loan forgiveness only in the pre- ____ __ ___ ____  ____________________ 3The district court dismissed the unfair trade practice claim, a decision not challenged on appeal.  4 default stage of "routine" loan administration, but that 13 _______ gave First National the right to choose any "course of action" thereafter. Id. at *3. The court ruled also that even if the ___ Agreement were determined ambiguous, Den norske's extrinsic evidence was insufficient to support a rational inference that the parties intended to give Den norske a post-default veto. Id. ____________ ___ at *4 ("The extrinsic evidence submitted by the plaintiff is unpersuasive and does not create an ambiguity or a genuine issue of material fact."). II II DISCUSSION DISCUSSION __________ Den norske presents a two-part challenge to the summary judgment ruling. First, it contends that proper contract inter- pretation requires summary judgment against First National because 11 unambiguously ordains that First National cannot unilaterally "reduce the amount of the [Glades Road] Loan princi- pal" under any circumstances, including the borrower's default, _____ ___ _____________ and no provision in 13 countermands the specific prohibition in 11. Second, even assuming 11 and 13 were ambiguous or inconsistent, Den norske's extrinsic evidence raises genuine factual disputes as to whether the contracting parties intend- ed to afford Den norske a unilateral veto over any post-default loan forgiveness [hereinafter: "veto"] which cannot be re- solved at summary judgment.  A. Applicable State Law  A. Applicable State Law ____________________ Interpretation of the Agreement is governed by Massa- 5 chusetts law. See Agreement 22. Normally, contract interpre- ___ tation is a question of law for the court. Fairfield 274-278 __________________ Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992); ________________ ____ Freelander v. G. & K. Realty Corp., 258 N.E.2d 786, 788 (Mass. __________ _____________________ 1970). Should the court find the contract language unambiguous, we interpret it according to its plain terms. See Dwek, 970 F.2d ___ ____ at 993; Hiller v. Submarine Signal Co., 91 N.E.2d 667, 669-70 ______ _____________________ (Mass. 1950).  If, however, the contract language is ambiguous, on its face or as applied, contract meaning normally becomes a matter for the factfinder. See Dwek, 970 F.2d at 993; Freelander, 258 ___ ____ __________ N.E.2d at 788. Although not admissible either to contradict or alter express terms, extrinsic evidence is admissible to assist the factfinder in ascertaining the intent of the parties as imperfectly expressed in ambiguous contract language. See Robert ___ ______ Indus., Inc. v. Spence, 291 N.E.2d 407, 410 (Mass. 1973). In ____________ ______ descending order of importance, extrinsic evidence may include: (1) the parties' negotiations on the particular loan, see Merri- ___ ______ mack Valley Nat'l Bank v. Baird, 363 N.E.2d 688, 690 (Mass. ________________________ _____ 1977); Charles River Mortgage Co. v. Baptist Home of Mass., 630 ___________________________ ______________________ N.E.2d 304, 306 (Mass. App. Ct.), review denied, 636 N.E.2d 278 ______ ______ (Mass. 1994); (2) their course of performance, see Affiliated FM ___ _____________ Ins. Co. v. Constitution Reins. Corp., 626 N.E.2d 878, 882 n.10 ________ __________________________ (Mass. 1994) (citing Restatement (Second) of Contracts 203(b) (1981)); (3) their prior course of dealing, see id.; and (4) ___ ___ trade usage in the relevant (viz., banking) industry, see id. at ___ ___ 6 881-82 (citing Restatement 222 cmt. b (1981); A.J. Cunningham _______________ Packing Corp. v. Florence Beef Co., 785 F.2d 348, 351 (1st Cir. ______________ _________________ 1986)); Baccari v. B. Perini & Sons, Inc., 199 N.E. 912, 915-16 _______ _______________________ (Mass. 1936); see also Jamesbury Corp. v. Worcester Valve Co., ___ ____ _______________ ____________________ 443 F.2d 205, 210 (1st Cir. 1971) (citing 3 Arthur L. Corbin, Corbin on Contracts 542, at 108 (1970)).  ___________________ B. Standard of Review  B. Standard of Review __________________ We examine a grant of summary judgment de novo, with a __ ____ view to whether there is a "genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Byrd v. Ronayne, 61 F.3d ___ ____ _______ 1026, 1030 (1st Cir. 1995). Once the moving party (First Nation- al) makes this showing, the party bearing the ultimate burden of proof (Den norske) cannot rest on mere allegations, but must proffer sufficient competent evidence upon which a rational trier of fact could find in its favor. See, e.g., Milton v. Van Dorn ___ ____ ______ ________ Co., 961 F.2d 965, 969 (1st Cir. 1992) (citing Anderson v. ___ ________ Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)); see also Celotex ____________________ ___ ____ _______ Corp. v. Catrett, 477 U.S. 317, 322 (1986). "'[A]n argument _____ _______ between parties about the meaning of a[n] [ambiguous] contract is typically an argument about a "material fact,"'" and summary judgment is normally unwarranted unless "'the [extrinsic] evi- dence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide [to] the con- trary.'" Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992) _____ ___________ (quoting Boston Five Cents Sav. Bank v. Secretary of Dep't of _____________________________ _______________________ 7 HUD, 768 F.2d 5, 8 (1st Cir. 1985)); Blanchard v. Peerless Ins. ___ _________ _____________ Co., 958 F.2d 483, 491 (1st Cir. 1991) (same). Nonetheless, we ___ must resolve all genuine factual disputes, and any competing rational inferences, in the light most favorable to Den norske, the party against whom summary judgment entered. See Byrd, 61 ___ ____ F.3d at 1030.  C. Interpretation of Participation Agreement C. Interpretation of Participation Agreement _________________________________________ 1. Contract Ambiguity 1. Contract Ambiguity __________________ The district court found that the Agreement unambigu- ously afforded First National, qua majority participant, the ___ unilateral right to forgive principal on post-default loans. Den ____ ___ norske Bank AS, 1993 WL 773796, at *3. The court reasoned that ______________ the prohibition against debt forgiveness in 11, 1, applies only to pre-default loans. See supra Section I. Section 11,  ____ ___ ___ _____ 2, of the Agreement refers to "other matters concerning the _____ _______ routine administration of the loan." (Emphasis added.) The phrase _______ "other matters" suggests that 2 is residual; that is, 1 describes all other "matters" relating to "routine" loan adminis- tration not described in 2. By definition, post-default ____ administration of a loan is not "routine," and therefore cannot ___ be governed by 11. We do not agree.  First, though the district court drew a perfectly plausible inference from the contract language, we do not think it can be considered the only reasonable inference. For one ____ thing, the 11 caption states "Approval of Principal's Actions," _______ not "Approval of Principal's Pre-default Actions." The district ___________ 8 court implicitly assumed that the phrase "concerning the routine administration of the loan," in 2, stood in apposition to the term "matters," whereas it is as faithfully understood to refer to the phrase "other matters." In other words, 11, 2, can be construed to suggest that 11, 1, adverts to "other matters" (i.e., actions taken by the lead bank) of such overriding impor- tance to minority participants as to preclude their characteriza- tion as "routine" matters.  Next, if the contracting parties intended to supplant, __ ________ in its entirety, the 11 definition of the parties' rights and __ ___ ________ obligations upon the occurrence of a borrower default, 11, 3, is oddly couched. For instance, 11, 3, does not say: "In the event of default, the parties agree that loan administration _______ will be governed (or controlled) by Section 13." Rather, the ________ __________ choice of language is more inscrutable: "In all cases pertaining to default, [First National] agrees to adhere to Paragraph 13." _____ ________ ______ (Emphasis added.) This language lends conspicuous ambiguity in at least two significant respects. First, ostensibly it imposes a contractual obligation (i.e., "adherence") upon First National alone, and not on Den norske. It suggests that though 13 _____ ___ ___ __ ___ ______ imposed additional obligations on First National, see, e.g., ___________ ___ ____ Agreement 13 (noting that, if the majority of participants cannot reach a consensus, First National, qua Principal, must ___ "adhere" to loan documents in selecting "appropriate remedies"), it was not intended to supplant any Den norske contractual right _____ already enumerated in 11. And, at least arguably, the broad- 9 based caption to 11 "Approval of Principal's Actions"  _______ intimates that Den norske's unconditional right of veto extends to matters embraced by the phrase "courses of action" in 13. ______ Second, unlike "govern" and "control," the verb "adhere" cannot be read to rule out the possibility that 13 merely supplements ___________ 11 and does not displace it as the only provision defining the ________ parties' contractual rights and obligations in the post-default period.  First National counters that Den norske's alternate interpretation would render 13 a virtual nullity, see Merchants ___ _________ Nat'l Bank v. Stone, 5 N.E.2d 430, 433 (Mass. 1936) (noting that, __________ _____ where possible, no part of contract should be deemed superflu- ous),4 since it would preclude First National from pursuing some otherwise appropriate "courses of action" following a default by the borrower. On the contrary, though Den norske's interpreta- tion may limit First National's post-default prerogatives under  _____ 13, clearly it does not render 13 wholly superfluous. So con- ___________ strued, section 13 still would reserve considerable decisional latitude to the lead bank, permitting First National to choose any post-default "course of action," even an innovative one not  ____________________ 4Meeting parry for thrust, Den norske argues that First National's interpretation would render 11, 1, a nullity, since a lead bank rarely (if ever) would have occasion (or need) to forgive a loan unless the borrower were in default. Although this proposition has some appeal, it suffers from the same defect as First National's "nullity" argument; viz., neither conclu- _______ sively resolves the facial contract ambiguity so as to enable ______ ______ summary judgment. Of course, customary banking practices may be introduced as circumstantial extrinsic evidence of usage of trade, from which a jury might infer contract meaning. See infra ___ _____ Section II.C.2(b). 10 specifically described in the loan documents, as long as it did not choose a course of action (e.g., unilateral loan principal forgiveness) expressly prohibited under 11, 1.  _________ __________ First National next argues that its interpretation represents the only "common sense" reading of the Agreement that comports with the economic realities underlying loan partici- pation agreements, which are by their very nature risk-spreading ______________ financial arrangements. Thus, a lead bank (at least one which remains the majority participant) retains a much greater finan- cial stake in maximizing loan recoveries than do the minority participants. Consequently, upon a default a minority partici- pant should not be able to take unfair advantage of the majority participant by invoking a veto, thereby forcing the majority either to take a "course of action" it deems inappropriate, or to buy out the minority participant's share at a premium. See, ___ e.g., First Nat'l Bank of Louisville v. Continental Ill. Nat'l ____ _______________________________ _______________________ Bank & Trust Co. of Chicago, 933 F.2d 466, 470 (7th Cir. 1991) ____________________________ ("The banks that had financed five-sixths of the loan thought it in their best interest not to call the loan, despite the borro- wer's default. Given that decision, it was in [the minority participant's] interest to play dog in the manger . . . ."); see ___ also Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n, ____ ____________________________ __________________________ 604 F.2d 464 (7th Cir. 1979); Mark Twain Bank v. Continental ________________ ___________ Bank, N.A., 817 F. Supp. 792 (E.D. Mo. 1993).  __________ The "economic realities" driving participation agree- ments vary too widely in individual cases to control the "four 11 corners" analysis of the Agreement in this case.5 As with all contracting parties, "each bank [negotiating a participation agreement] wants to preserve, so far as possible, its freedom of __ ___ __ ________ action," First Nat'l Bank of Louisville, 933 F.2d at 470 (empha- ______________________________ sis added), yet this intuition is tempered by its assessment as to the financial benefits which would accrue in the event a mutually acceptable "compromise" agreement can be achieved. For example, lead banks utilize participation agreements (1) to spread credit risks by diversifying their loan portfolios, see ___ Banco Espanol de Credito v. Security Pac. Nat'l Bank, 973 F.2d _________________________ _________________________ 51, 53 (2d Cir. 1992), cert. denied, 113 S. Ct. 2992 (1993); W.C. _____ ______ Lott, et al., Structuring Multiple Lender Transactions, 112 ___________________________________________ Banking L.J. 734 (1995); Note, Bankruptcy and the U.C.C. as ______________________________ Applied to Securitization, 73 B.U. L. Rev. 873 (1993); (2) to _________________________ avoid regulatory lending limits, see, e.g., 12 C.F.R. 32.107 ___ ____ (1985), thereby permitting lead banks to make more capital available to important commercial clients, see Andrew Strehle, ___ Teaching Old Laws New Tricks: The Prospect for Loan Participation _________________________________________________________________ Regulation, 13 Ann. Rev. Banking L. 421, 423-24 (1994); and (3) __________ to generate fees from servicing and administering loans. See ___  ____________________ 5See generally Eric M. Schiller, Scott A. Lindquist, & ___ _________ Christopher Q. King, Current Issues in Loan Participation and Co- ____________________________________________ Lending Agreements, C974 ALI-ABA 457, 464 (1995) ("Generalizing __________________ about enforcement of loan participation and co-lending agreements is nearly impossible. Although there is some uniformity in terms among these agreements, the resolution of any conflict will necessarily turn almost entirely upon the precise terms of the contracts, which may differ substantially from one transaction to the next. Moreover, in applying legal standards prescribed by the contracts, consideration of the facts and circumstances of each individual case is necessary.").  12 generally First Nat'l Bank of Belleville v. Clay-Hensley Comm'n _________ _______________________________ ___________________ Co., 525 N.E.2d 217, 219-20 (Ill. App. Ct. 1988) (describing ___ various "lead bank" incentives for negotiating participation agreements).6 It cannot be ascertained conclusively solely ______ by scrutinizing the terms of the Agreement how much First National was prepared to concede, in 1986, to obtain Den norske's __ ____ agreement to advance $7.5 million and to assume a percentage of the risk associated with the Glades Roads Note. Accordingly, there is no reliable way to identify the particular economic realities at work in the First National-Den norske loan partici- pation relationship without recourse to extrinsic evidence. See ___ infra Section II.C.2. _____ Finally, the cases First National relies upon as support for its "economic reality" interpretation are inapposite. In Carondelet, for example, the participation agreement was __________ utterly silent as to the existence of an analogous minority-held ______ veto (over decisions whether to declare loan defaults), whereas the Agreement in our case clearly incorporates a veto provision ( 11, 1), though its intended scope (i.e., pre- or post- _____ default) is demonstrably ambiguous. Carondelet Sav. & Loan _________ ________________________ Ass'n, 604 F.2d at 470; see also First Nat'l Bank of Louisville, _____ ___ ____ ______________________________ 933 F.2d at 470 (noting that minority participant's contract interpretation "lacks textual support"). Moreover, the Seventh  ____________________ 6By contrast, minority participants look to limit credit search and administration costs associated with making direct loans or investments, see Note, 73 B.U. L. Rev. at 873, and to ___ ____ obtain higher interest rates on their investments, see Banco ___ _____ Espanol de Credito, 973 F.2d at 53.  __________________ 13 Circuit ultimately discussed "economic realities" only in con- junction with its review of the extrinsic evidence of custom and _________ ________ usage credited by the factfinder, and not in connection with the question whether the agreement was facially unambiguous as a __ _ matter of law. Carondelet Sav. & Loan Ass'n, 604 F.2d at 470. ______ __ ___ _____________________________ Finally, Carondelet was an appeal from a final judgment for the __________ _____ ________ lead bank following a bench trial, and not from a grant of _____ _____ summary judgment. Id. at 468. There the factfinder's assessment ___ of extrinsic evidence would have been reviewed only for clear error. 2. Extrinsic Evidence 2. Extrinsic Evidence __________________ As the Agreement is amenable to more than one reason- able interpretation, we must determine whether Den norske adduced enough competent extrinsic evidence of the contracting parties' intent to support a rational jury verdict in its favor. See ___ Blanchard, 958 F.2d at 491. The district court concluded that _________ the extrinsic evidence proffered by Den norske could not support a rational inference that 11 and 13 afforded Den norske a post-default veto. Den norske Bank AS, 1993 WL 773796, at *4. ___________________ The Den norske extrinsic evidence pertains to the contract negotiations and to "usage of trade" in the banking industry. (a) Contract Negotiations (a) Contract Negotiations _____________________ Den norske adduced evidence that First National normal- ly used its own standardized form contract for all its participa- tion agreements in the mid-1980s, that First National's Florida- based loan officers were permitted to customize these agreements 14 in negotiations with prospective minority participants, and that Liska Langston, one of these loan officers, wrote a letter in April 1986 noting that specific changes had been made to the ________ _______ First National-Den norske agreement. Langston highlighted the changes on a copy of the "revised Participation Agreement," _______ including an entirely redrafted version of 11. Den norske _________ __ ________ _________ _______ __ _ __ contends that this circumstantial evidence invites a rational inference that it deliberately negotiated changes to the stan- dardized version of 11 to assure itself a veto. See In re 604 ___ _________ Columbus Ave. Realty Trust, 968 F.2d 1332, 1358 (1st Cir. 1992) __________________________ (noting that, under Massachusetts contract law, specifically negotiated contract terms normally control over standardized __________ ____________ contract provisions) (citing Carrigg v. Cordeiro, 530 N.E.2d 809, _______ ________ 813 (Mass. App. Ct. 1988), review denied, 536 N.E.2d 612 (Mass. ______ ______ 1989)).  First National responds that the extrinsic evidence proffered by Den norske is insufficient, for two reasons. It cites affidavits and depositions which attest that (i) the so- called "revised" version of 11 actually was part of a standard- ized First National form; or (ii) the negotiating officers (including Liska Langston) could not recall having discussed any _________ proposed 11 changes with Den norske in 1986. These conten- tions, which bear on the weight to be given the circumstantial ______ evidence proffered by Den norske, do not undermine Den norske's argument that genuine issues of material fact remain unresolved. See Byrd, 61 F.3d at 1030.  ___ ____ 15 First, it is not at all surprising that a loan officer might not recall the unrecorded details of a decade-old negotia- __________ tion, such as particular oral conversations. Moreover, Langston ____ _____________ confirmed that her signature appears on the April 1986 letter highlighting certain substantial "changes" and "revis[ions]" to standardized form 11 arrived at through negotiation. Thus, the authenticated, uncontradicted April 1986 letter signed by Lang- ston could support a rational inference that Den norske had proposed specific changes in 11, and that First National was announcing its agreement with the Den norske counterproposal. See Deposition Exhibit No. 6 (Langston Letter dated April 14, ___ 1986) ("[A]dvise us as soon as possible if you concur [with these "changes" and "revis[ions]]."). In the same vein, Den norske proffered participation agreements it negotiated with lead banks other than First Nation- al, wherein it consistently reserved a minority veto, as circum- ____________ stantial evidence that Den norske would not have intended that its First National loan participation be any exception. See ___ Vadala v. Teledyne Indus., Inc., 44 F.3d 36, 39 (1st Cir. 1995) ______ ______________________ ("Certainly the fact that there is a pattern of occurrences, reflecting an apparent cause and effect sequence, can strengthen the likelihood that the present case is one more in the pattern. This is how human beings reason about circumstantial evidence."). Coupled with other extrinsic evidence proffered by Den norske, see infra Section II.C.2(b), these exhibits if admitted at ___ _____ trial and credited by the jury could contribute to a rational 16 inference that the contracting parties intended to depart from the standardized First National form versions of 11 and 13 so as to provide Den norske with a veto over any loan forgiveness arrangement. See In re 604 Columbus Ave. Realty Trust, 968 F.2d ___ ____________________________________ at 1358. (b) Usage of Trade (b) Usage of Trade ______________ Den norske proffered extrinsic evidence pertaining to the relevant 1985-86 period that it was common, industry- _________ wide, to incorporate such minority participant veto powers over ____ loan forgiveness arrangements. The evidence took three forms: (1) affidavits from current and former commercial loan officers (viz., Den norske Vice President David Schwarz and former Vice President Daniel deMenocal) based on their personal knowledge of banking industry practices; (2) learned treatises on the banking industry, see, e.g., Sandra Stern, Structuring Loan Participation ___ ____ ______________________________ 1.05(1)(d), at 1-20 (1992) ("Typically, participation agree- ments provide that the lead bank may agree to modification of the loan documents [if the loan becomes delinquent] . . . as long as __ ____ __ it does not reduce the amount of principal due . . . .") (empha- __ ____ ___ ______ ___ ______ __ _________ ___ sis added);7 and (3) participation agreements negotiated by Den  ____________________ 7See generally Eric M. Schiller, Scott A. Lindquist, Chris- ___ _________ topher Q. King, Current Issues in Loan Participation and Co- _______________________________________________ Lending Agreements, C974 ALI-ABA 457, 479-80 (1995) ("Most ___________________ participation agreements allow fairly broad discretion to the lead lender on the issue of when to declare the loan in default or initiate enforcement action. This is quite logical given that the lead lender generally has the best understanding of the loan, the borrower, and the current situation. However, the lead lender's flexibility in dealing with loan defaults and remedies may not be as broad as it might at first appear. For example, the lead lender may be prohibited from waiving, releasing, or __________ 17 norske with other lead banks, wherein Den norske consistently reserved such a veto. First National argues that this "usage of trade" evidence is insufficiently probative, for three reasons.  First, it contends that Den norske's affiants were not qualified to give expert testimony on banking industry practices. We do not agree. Whatever may have been Schwarz' qualifica- tions,8 deMenocal was a forty-year banking veteran (with Citi- __________ bank and Den norske) who attested that he had (i) served as a vice-president in charge of "large commercial loan transactions," (ii) had "become very familiar with participation agreements from the perspective of both the lead bank and the participating banks," and (iii) observed firsthand the "well established industry custom[] and practice[]" to allow such minority-partici- pant vetoes. Under Massachusetts law, this is the type of testimony through which "usage of trade" is established. See, ___ e.g., Baccari, 199 N.E. at 916 (noting that "[t]he testimony of a ____ _______ witness who had been employed as a road builder for twenty-eight ____________ years was sufficient to warrant a finding of a usage, and that _____ these parties contracted with reference to it," and observing that the "credibility" of witnesses describing usages of trade  ____________________ modifying material provisions of the loan documents, particularly _________ ________ __________ ____________ payment provisions.") (emphasis added).  _______ __________ 8First National argues that Schwarz is not competent to provide expert testimony on "usage of trade" because he did not deal frequently with loan participation agreements; thus, he could not form a reliable opinion as to prevalent banking prac- tices. Since deMenocal's qualifications, at least those dis- closed in the summary judgment record, clearly were sufficient to establish competence, we need not resolve the challenge to the Schwarz affidavit.  18 ultimately is a factual question "for the master") (emphasis _______ added); Barry v. Quimby, 92 N.E. 451, 453 (Mass. 1910) ("The _____ ______ witness [on 'usage'] testifies to the existence of a fact from actual knowledge, acquired through observation and experience in the business . . . ."); Industrial Eng'g & Metal Fabricators, _______________________________________ Inc. v. Fontaine Bros., 319 N.E.2d 726, 727-28 (Mass. App. Ct. ____ ______________ 1974) (discerning no error in factfinder's reliance on affidavit of person whose "recitation of his background and qualifications affirmatively demonstrated his competence to testify of his own personal knowledge on the factual issue of whether there was a custom in the trade") (citation omitted); see also Leibovich v. ___ ____ _________ Antonellis, 574 N.E.2d 978, 982 (Mass. 1991) (noting that jury is __________ arbiter of "soundness" of expert testimony, and that "[o]ne factor in assessing the strength of expert testimony is the expert's knowledge and experience"). First National has not demonstrated to our satisfaction that deMenocal would not be permitted to provide expert testimony at trial. See Fed. R. ___ Evid. 702, 703; Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 _______ _________________________________ S. Ct. 2786 (1992) (noting that trial court serves "gatekeeper" function in determining competency, qualifications, and "helpful- ness" of expert testimony); see also United States v. Saccoccia, ___ ____ _____________ _________ 58 F.3d 754, 781 (1st Cir. 1995) (same). Moreover, Den norske cites to published treatises on standard banking practices, excerpts from which may be admissible at trial in support of deMenocal's testimony. See Fed. R. Evid. 803(18); Carondelet ___ __________ Sav. & Loan Ass'n, 604 F.2d at 470 (noting that defendant relied __________________ 19 on expert testimony and learned treatises to prove usage of trade, in order to discern meaning of ambiguous language in loan participation agreement).9  Second, First National argues that the expert testimony proffered by Den norske merely represented self-serving state- ments which would help their employer, since both affiants were Den norske employees. Once again, however, we are not persuaded that First National has demonstrated that the expert qualifica- ______ __________ tions of these affiants are undermined by their present and _____ former association with Den norske so as to render their testimo- ny inadmissible. Of course, such matters may bear heavily on ____________ witness credibility, bias, and the weight of the evidence. But these are matters for the factfinder. See Newell Puerto Rico, ___ ___________________ Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 23 (1st Cir. 1994); Leibo- ____ ________________ ______ vich, 574 N.E.2d at 982 (noting that it is "[t]he jury's func- ____ tion, vis-a-vis an expert witness, . . . to assess the soundness and credibility of his opinions"). At summary judgment, more- over, courts normally assume that the trier of fact would credit the expert testimony proffered by the nonmovant (i.e., Den norske). See Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 ___ _______ _________________ (1st Cir. 1995); Affiliated FM Ins. Co., 626 N.E.2d at 882 ("The ______________________  ____________________ 9Of course, the claim that First National was unaware of the "usage of trade" described by deMenocal is not controlling. See, ___ e.g., Berwick & Smith Co. v. Salem Press, Inc., 117 N.E.2d 825, ____ ___________________ __________________ 827 (Mass. 1954) (noting that proof of defendant's "actual knowledge" of usage is unnecessary; "`[w]here the usage is established the presumption is that the parties contracted with ___________ reference to it'") (quoting Baccari, 199 N.E. at 916) (emphasis _______ added). 20 existence and scope of a usage of trade are questions of fact.") (citing Restatement (Second) of Contracts 222(2) (1981); DiMarzo v. American Mut. Ins. Co., 449 N.E.2d 1189, 1201 (Mass. _______ _______________________ 1983)); see also U.C.C. 1-205(2). ___ ____ Finally, First National argues that the proffered expert testimony is insufficiently probative of banking industry practices because it merely evidences "that participants general- ly attempt to negotiate such protections," not that they gener- _______ _________ ally succeed in obtaining such concessions from the lead _______ bank.10 Quite the contrary, the "typical" participation agreement usage with which Den norske's experts were familiar, and to which presumably they would testify, is that a minority participant veto is the industry norm. Moreover, if First National means to suggest that such "general" practices are not probative as to whether it is more or less likely that particular __________ contracting parties harbored such an intent, it is simply in error. Cf. U.C.C. 1-205(2) (noting that "usage of trade" ___ includes "any practice or method of dealing having such regulari- ____ _________  ____________________ 10First National further argues that "demenocal is not ___ entirely supportive of Den norske's position," in that he assert- ________ __________ ed that it was "possible" that an "indirect" minority participant might not have enough bargaining power to insist on a veto. DeMenocal described an inapposite scenario called an "indi- rect" participation in which an original lender participant enters into a second and collateral participation agreement with ______ a "third bank" in order to allocate, inter se, the original _____ __ participant's credit risk on the underlying loan. DeMenocal correctly noted that the "third bank" in such a scenario would have no direct contractual relationship with the borrower. Although Den norske (like most "direct" loan participants) likewise has no contractual relationship with the borrower  Glades Roads see supra note 2, it is in no sense the type of ___ _____ "indirect" participant described by demenocal.  21 ty of observance . . . as to justify an expectation that it will __ be observed with respect to the transaction in question") (empha- sis added); Carondelet Sav. & Loan Ass'n, 604 F.2d at 470 (noting ____________________________ that lead bank's extrinsic evidence of industry custom and usage, in the form of witness testimony and treatises, was admissible because it made it more "likely" that the contracting parties would not have intended to use an ambiguously broad term like "servicing" to exclude the lead bank's unilateral right to modify the loan documents if the industry custom were otherwise); Affiliated FM Ins. Co., 626 N.E.2d at 882 ("The existence and _______________________ scope of a usage of trade are questions of fact.") (emphasis _____ added). The precise function of "usage of trade" evidence is to provide circumstantial proof of the contracting parties' intent. ______________ A party need not show that all participation agreements invari- ___ ably entitle minority participants to post-default vetoes. See ___ id. ("Where, as here, the contract language is ambiguous, evi- ___ dence of custom and trade practice may be admitted to arrive at an interpretation `"which appears to be in accord with justice and common sense and the probable intention of the parties."'") ________ _________ __ ___ _______ (citations omitted; emphasis added).11   ____________________ 11First National likewise cites Den norske's internal credit manuals, which suggest that Den norske loan officers not agree to minority participant vetoes in any participation agreement negotiated for Den norske as lead bank. Viewed in the light most __ ____ ____ favorable to Den norske, however, these manuals merely suggest the obvious truth that it is likely that lead banks will almost always negotiate to avoid a minority participant veto provision. _________ See supra Section II.C.1 (discussing First National's "economic ___ _____ reality" theory). By contrast, "usage of trade" deals not with contract negotiation, but with the "typical" end product included ___ _______ in negotiated loan participation agreements. 22 III III CONCLUSION CONCLUSION __________ We therefore conclude that Den norske adduced suffi- cient competent extrinsic evidence which, if admitted at trial and credited by the jury, could support a rational verdict in its favor. The parties agree that the disposition of the breach of contract claim controls the breach of fiduciary duty claim. Consequently, the summary judgment entered on counts 1 and 2 must ___ _______ ________ _______ __ ______ _ ___ _ ____ be vacated. The case is remanded for further proceedings consis- __ _______ ___ ____ __ ________ ___ _______ ___________ _______ tent with this opinion. Costs to appellant. ____ ____ ____ _______ _____ __ _________ So ordered.  So ordered. __ _______ 23